UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. _____-Civ-_____

| | | |
|---|---|---|
| CITY OF ST. CLAIR SHORES POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| NATIONSTAR MORTGAGE HOLDINGS INC., JESSE K. BRAY and ROBERT D. STILES, | ) ) ) ) ) | |
| Defendants. | ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff City of St. Clair Shores Police and Fire Retirement System ("plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Nationstar Mortgage Holdings Inc. ("Nationstar" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by or about the Company and certain judicial records of proceedings described herein.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers of the common stock of Nationstar between February 27, 2014 and May 4, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against Nationstar and certain of its senior executives for violations of the federal securities laws.

2.      Defendant Nationstar is now the nation's second largest non-bank subprime mortgage servicer.  In this capacity, Nationstar collects mortgage premiums and otherwise services mortgages for loans owned by other entities.

3.      Until late 2013, Ocwen Financial Corporation ("Ocwen") and entities affiliated with Ocwen had grown to become the nation's largest non-bank subprime mortgage servicer by purchasing mortgage servicing rights ("MSRs") from banking entities who no longer wanted to service their own portfolios due to increased regulatory attention.

4.      However, by late 2013, federal regulators, followed in early 2014 by New York state regulators, commenced regulatory enforcement actions against Ocwen accusing it of illegally

gouging customers and improperly profiting from doing so.  By 2014, the Ocwen-related entities, mired in litigation and facing delisting proceedings, began retreating from the loan serving industry.

5.      Nationstar grew its own portfolio exponentially by purchasing MSRs from Ocwen and from banks that Ocwen could no longer purchase from, promising that due to the Company's own superior loan handling proficiencies and ability to comply with the law while profitably servicing loans, Nationstar could be profitable where Ocwen had not been.  Beginning in early 2014, Nationstar began acquiring tens of millions of dollars of MSRs from Ocwen and other bank entities.

6.      Throughout the Class Period, Nationstar claimed to be improving profitability as a result of increased servicing revenue on its exponentially expanding MSR portfolio, leading to servicing fee profits, and as a result of profits being "earned" by its Solutionstar subsidiary, with which it had contracted to provide various loan services.  As the Company reported quarter after quarter of growing revenue and profits through the second quarter ("2Q") of 2014, the price of Nationstar stock soared, reaching a Class Period high of almost $38 per share by June 6, 2014.

7.      However, unbeknownst to investors, throughout the Class Period defendants knew or recklessly disregarded that:

(a)      Nationstar's deficiencies in management control and supervision rendered it unable to comply with laws and regulations applicable to servicing MSRs;

(b)      Nationstar was gouging mortgagors – and illegally enhancing its profits through unsustainable means – via illicit practices, such as charging for repeated, unnecessary inspections, which resulted in additional late payment fees, and by pressuring mortgagors to carry out expensive modifications and refinancing of their mortgages;

(c)     Solutionstar's increasing profitability was largely attributable to unlawful and inappropriate customer gouging, rather than improving business metrics;

(d)     Heightened regulatory scrutiny into MSR transferring and servicing – including a probe into Nationstar's own loan servicing practices launched by the New York State Department of Financial Services ("NY DFS") in March 2014 – had significantly increased Nationstar's costs of servicing MSRs and diminished the profitability and carrying value of the Company's MSR portfolio;

(e)     In order to deflect regulatory scrutiny in the wake of the regulatory enforcement actions taken against Ocwen, Nationstar had abandoned certain of its own abusive loan servicing practices and adopted others required by regulators, which had made its loan servicing business less profitable and rendered Nationstar's MSR portfolio less valuable to the Company;

(f)     The adverse facts listed in (a)-(e) above were reasonably likely to have a material adverse effect on Nationstar's future revenue and operating results; and

(g)     As a result of (a)-(f) above, defendants lacked a reasonable basis to believe their Class Period statements about Nationstar, its business operations and its financial prospects.

8.     On November 6, 2014 the Company reported its 3Q 2014 financial results for the period ended September 30, 2014.  Nationstar reported a sequential revenue decline, causing the price of its stock to close down below $28 per share.  To keep the stock price artificially inflated, defendants claimed the revenue short-fall was short-lived and promised stronger results in 4Q 2014 and FY 2015.

9.     In January 2015, Nationstar was named as a defendant in a federal civil action accusing the Company of racketeering activity and seeking hundreds of millions of dollars in

damages on a classwide basis and alleging that the Company essentially paid itself kickbacks through its Solutionstar billings for improper fees.

10.     When the Company reported its 4Q and FY 2014 results on February 26, 2015, the stock price again plunged 13% to close at $27.05 per share, as the market learned that rather than the earnings per share ("EPS") of $0.95 on revenue of $537 million Nationstar had led the market to expect based on its Class Period statements, the Company reported EPS of just $0.21 on revenue of $450 million, 75% and almost 20% less, respectively, than Nationstar had led the market to expect. The Company blamed higher servicing expenses and increased amortization and reported having to take a $46 million write-down on its MSR portfolio.  However, in an effort to keep the stock price artificially inflated, the Company assured investors that its business metrics were still strong and stated that it was still on track to achieve strong financial results in FY 2015, including profits of $4 to $5 per share.

11.     On March 24, 2015, with the price of Nationstar common stock trading above $31 per share and its 2015 first quarter essentially complete, the Company announced that it was selling 20 million shares of its common stock at $28.49 per share, for proceeds of $575 million, in an underwritten public offering.  The market was shocked and the price of Nationstar common stock fell more than $5 per share, more than 16%, to close below $26 per share on March 25, 2015.

12.     On May 5, 2015, before the open of trading, Nationstar reported its 1Q 2015 results, which caused the price of its common stock to plunge by approximately $6.66 per share, or more than 25%, on unusually high trading volume, when the Company disclosed that rather than the EPS of $0.70 on $514 million in revenue the Company had led the market to expect, Nationstar had instead generated a massive net loss of $48.3 million, or ($0.53) per share, as the Company's

- 4 -

revenue tumbled 15% year-over-year to $382 million, reflecting a 49% sequential plunge in quarterly revenue in its servicing segment to $109 million.  Much of the loss came from an additional $110 million ($0.77 per share) write-down on the value of the Company's MSRs.

13.     While Nationstar blamed the decline on lower interest rates causing higher pre-payments, commentators recognized that in reality, it was "heightened scrutiny into the servicing space by regulators such as the Benjamin Lawsky-headed New York Department of Financial Services" which had significantly diminished profits in and the carrying value of the Company's servicing business.  Others recognized that the "'primary drivers behind the weaker quarter included a decline in contribution from Solutionstar and higher amortization & other related cost at the servicing unit.'"

**JURISDICTION AND VENUE**

14.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5.  Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  The nexus of the misconduct alleged herein occurred largely in this District.

16.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone communications.

## THE PARTIES

17.     Plaintiff City of St. Clair Shores Police and Fire Retirement System purchased Nationstar common stock, as set forth in the accompanying certification, which is incorporated herein by reference, and has been damaged thereby.

18.     Defendant Nationstar engages in the servicing and origination of mortgage loans in the United States and internationally.  The Company's common stock is listed on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "NSM."  The Company has more than 109 million shares of its common stock issued and outstanding.

19.     Defendant Jesse K. "Jay" Bray ("Bray") is, and was at all relevant times, Nationstar's Chief Executive Officer ("CEO") and a member of its Board of Directors.  Defendant Bray previously served as Nationstar's Executive Vice President and Chief Financial Officer ("CFO") from May 2011 to February 2012.  In addition, he has served as the President of Nationstar's wholly-owned subsidiary, Nationstar Mortgage LLC, since July 2011, as the CEO of Nationstar Mortgage LLC since October 2011, as the CFO of Nationstar Mortgage LLC from the time he joined Nationstar in May 2000 until September 2012, as a Manager of Nationstar Mortgage LLC since October 2011, and as a director of another subsidiary, Nationstar Capital Corporation, since March 2010.

20.     Defendant Robert D. Stiles ("Stiles") is, and has been since May 2014, Nationstar's Executive Vice President and CFO.  Defendant Stiles also serves as Executive Vice President and CFO at Solutionstar which he joined in January 2013 and at Nationstar Mortgage LLC where he has served as Executive Vice President since May 2013.  Prior to joining Solutionstar, defendant Stiles

served as the CFO of Altisource Portfolio Solutions S.A. (a publicly traded real estate solutions provider that was spun-off from Ocwen) from 2009 to 2012.

21.     Defendants Bray and Stiles are collectively referred to herein as the "Individual Defendants."

22.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Nationstar, were privy to confidential and proprietary information concerning Nationstar, its products, operations, finances, financial condition, and present and future business prospects.  The Individual Defendants had access to non-public information about Nationstar's business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  The Individual Defendants also had access to material adverse non-public information concerning Nationstar.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

23.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Nationstar's business.

- 7 -

24.     As executive officers of Nationstar, the Individual Defendants controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

25.     The Individual Defendants, as executive officers and/or directors and as controlling persons of Nationstar, a publicly traded company whose common stock was governed by the federal securities laws and was registered with the NYSE, had a duty to promptly disseminate accurate and truthful information with respect to Nationstar's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Nationstar common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Nationstar common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Nationstar's business, operations and management and the intrinsic value of Nationstar common stock; (ii) permitted Nationstar to raise $500 million dollar in an equity offering to "provide[] cash to fund current and prospective MSR

acquisitions"; and (iii) caused plaintiff and members of the Class to purchase Nationstar common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Nationstar during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Nationstar had approximately 109 million shares of common stock outstanding, which shares were actively traded in an efficient market on the NYSE.

29.     While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nationstar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

31.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Nationstar;

(c)     whether the trading price of Nationstar common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND TO THE CLASS PERIOD

34.     Nationstar is now the second largest non-bank mortgage servicer of subprime loans in the United States.  Nationstar earns fees through the delivery of servicing, origination and transaction-based services principally to single-family residences throughout the United States.  As a

non-bank mortgage servicer, Nationstar essentially acts as a third-party collection agency for banks and other entities that own mortgage portfolios, collecting payments from mortgage borrowers and handling other billing services.  As a mortgage servicer, Nationstar is charged with assisting delinquent borrowers in reworking their loan payments when they run into trouble in order to avoid foreclosure.  This promotes the interests of both the homeowners and the owners of the loans, and is federally mandated.

35.    State and federal regulators became critical of the rising number of foreclosures following the 2008 housing collapse and lenders' treatment of delinquent borrowers.

36.    In February 2012, 49 states and the District of Columbia entered into a $25 billion settlement with Ally Bank (formerly GMAC), Bank of America, Citicorp, JP Morgan Chase and Wells Fargo, five of the nation's biggest mortgage lenders, over a laundry list of improprieties from "robo-signing" foreclosure documents to failing to negotiate in good faith with homeowners over inflated fees and other charges that pushed them into default (the "National Mortgage Settlement"). The National Mortgage Settlement encouraged lenders to negotiate lower rates with existing borrowers and to lower principal amounts owed in an effort to keep houses out of foreclosure. Pursuant to new servicing rules under the National Mortgage Settlement designed to slow down foreclosures, the signing banks were prohibited from employing "robo-signing" in connection with foreclosures or paying agents to speed up foreclosures, took on new detailed paperwork obligations, and had to take a number of other steps before foreclosing, including reviewing any loan modification proposals the borrower made and giving borrowers two weeks to accept or reject any offer the bank made.  Separately, banks also faced regulations under Basel III, a comprehensive set

of reform measures, limiting the amount of capital they could risk on servicing rights, spurring them to offload their servicing businesses.

37.     Following the financial crisis, Ocwen, then the nation's largest non-bank mortgage servicing company, began buying up servicing rights from banks who were no longer willing to assume the substantial risks of servicing their own MSRs.

38.     On December 19, 2013, the Consumer Financial Protection Bureau (the "CFPB"), joined by 49 states and the District of Columbia, filed a complaint in the U.S. District Court for the District of Columbia alleging that Ocwen and other firms had violated, among other laws, the Unfair and Deceptive Acts and Practices laws of the plaintiff states and the Consumer Financial Protection Act of 2010 by deceiving consumers about their loans and engaging in illegal foreclosures. According to the complaint, investigators found evidence that, among other things, Ocwen gave borrowers false or misleading information, did not honor trial modifications begun by previous servicers, wrongly charged fees, and denied mortgage loan modifications to eligible borrowers. During a conference call held with reporters that day, CFPB director Richard Cordray stated that "'[t]oo often, trouble began as soon as the loan was transferred to Ocwen,'" adding that "'Ocwen made troubled borrowers even more vulnerable to foreclosure.'"

39.     Ocwen, the CFPB, and the 49 states and District of Columbia entered into a Consent Judgment also filed in the U.S. District Court for the District of Columbia on December 19, 2013, under which Ocwen was forced to fund a $2.1 billion mortgage settlement for mortgage servicing abuses (including $2 billion in first-lien principle reduction and $125 million for cash payments to borrowers whose loans had been foreclosed on).  According to the CFPB, "'Ocwen took advantage of borrowers at every stage of the process.'"  The $2.1 billion fine far exceeded Ocwen's $1.5 billion

of revenue during the first nine months of 2013, and dwarfed the $357 million in cash Ocwen then had on its books.

40.     Under the 2013 Consent Judgment, Ocwen was required to improve its oversight of its attorneys, bolster training for its employees, refrain from making collection calls when a borrower's application for a modification was pending, and increase its staff.  The 2013 Consent Judgment contained "Examination Findings" indicating that Ocwen suffered from:

a.      *Lack of controls related to document execution*, including evidence of robo-signing, unauthorized execution, assignment backdating, improper certification and notarization, chain of title irregularities, and other related practices affecting the integrity of documents relied upon in the foreclosure process;

b.      Deficiencies in loss mitigation and loan modification processes, including but not limited to:

1.      *Failure to effectively communicate with borrowers* regarding loss mitigation and other foreclosure avoidance alternatives;

2.      *Failure to account for documents submitted in tandem with application for loss mitigation assistance*;

3.      *Lack of reasonable expedience in approving or denying loss mitigation applications*;

4.      *Providing false or misleading reasons for denial of loan modifications*; and

5.      *Failure to honor the terms loan modifications for transferred accounts and continued efforts to collect payments under the original note terms*.

c.      *Lack of controls related to general borrower account management*, including but not limited to:

1.      Misapplication of borrower payments;

2.      Inaccurate escrow accounting and statements; and

3.      Assessment of unauthorized fees and charges.

d.    ***Inadequate staffing and lack of internal controls*** related to customer service;

e.    ***Deficiencies in control and oversight of third-party providers***, including but not limited to, local foreclosure counsel;

f.    ***Deficiencies in document maintenance processes***, including but not limited to, failure to produce documents requested in tandem with examinations; and

g.    ***Deficiencies in management control and supervision necessary to ensure compliance with applicable laws and regulations***.

41.    On January 22, 2014, Ocwen announced that it had agreed to purchase for $2.7 billion Wells Fargo Bank N.A.'s ("Wells Fargo") MSRs and related services advances relating to a portfolio of 184,000 loans with an unpaid principal balance of $39 billion.

42.    However, on February 6, 2014, citing Ocwen's potential inability to handle the servicing of additional loans, the NY DFS indefinitely placed Ocwen's acquisition of Wells Fargo's MSRs on hold.

43.    On Wednesday, February 19, 2014, the CFPB's deputy director, Steve Antonakes, sharply criticized the entire third-party mortgage servicing industry, stating that firms were still treating consumers poorly, despite years of pressure from government officials to improve their behavior.  The CFPB was threatening to crack down on the "shell games" it charged were being played amongst servicers, "where the first servicer says the transfer ended all of its responsibility to consumers and the second servicer says it got a data dump missing critical documents."

44.    Because Nationstar was not a party to the National Mortgage Settlement or the capital rules being levied on the banks, Ocwen's December 2013 Consent Judgment with the CFPB,  or the NY DFS's scrutiny of Ocwen's attempt to purchase the Wells Fargo MSR portfolio in January 2014, the Company was able to benefit from these developments.  During 2013, Nationstar bought $250

billion of MSRs and during 2014 purchased another $48 billion of MSRs, exponentially expanding its portfolio, by purchasing MSRs from Ocwen as that company's business crumbled, and from larger banks that were eager to offload their mortgage servicing units as questionable foreclosure practices attracted increasing regulatory scrutiny.  By December 31, 2014, Nationstar was servicing 2.3 million customers with an aggregate outstanding principal balance in excess of $381.1 billion, having more than doubled the size of its portfolio as Ocwen and the bigger banks retreated from collecting almost $10 trillion per year in mortgage payments.

45.     Meanwhile, unbeknownst to investors, Nationstar continued its practice of taking advantage of its customers through a variety of improper practices, allowing it to report quarter after quarter of record financial results and to forecast strong 2014 and 2015 revenue and earnings.

46.     By March 2014, the Company's mortgage servicing practices had gained the attention of the NY DFS.  On March 5, 2014, NY DFS Superintendent Benjamin M. Lawsky wrote to defendant Bray, stating in pertinent part as follows:

> Our recent review of Nationstar Mortgage LLC's Volume of Servicing Reports for the fourth quarter of 2013 disclosed a substantial increase in Nationstar's servicing activities since December 2012. Specifically, on a nationwide basis, the aggregate unpaid principal balance ("UPB") of mortgage loans serviced by Nationstar more than doubled from $126.5 billion at year-end 2012 to $283.3 billion at year-end 2013.  The Department identified an even faster growth pattern in the volume of New York loans serviced by Nationstar, which nearly tripled from 26,111 loans to 73,489 loans with an aggregate UPB increase from $5.6 billion to $14.3 billion from year-end 20 12 to year-end 20 13.

> *Additionally, we have received hundreds of complaints from New York consumers about your company's mortgage practices, including problems related to mortgage modifications, improper fees, lost paperwork, and numerous other issues*.

> As you may know, our Department has significant concerns that the explosive growth at Nationstar and other non-bank mortgage servicers may create capacity

issues that put homeowners at risk. Accordingly, the Department is requesting that Nationstar provide the following information as of January 31, 2014:

1.    A detailed breakdown of Nationstar's servicing portfolio on a nationwide basis, as well as separately for New York. The information should reflect the composition of the portfolio (i.e. current, default, in foreclosure, foreclosed) and the investor (GSE, Agency, Private Label);

2.    The number of staff in each business unit (e.g., customer service, loss mitigation, foreclosure, collections, complaints and escalation, etc.) and the volume of transactions per employee. Also provide the methodology that Nationstar uses to assign workloads to individuals in loss mitigation, foreclosure, and escalation functions.

3.    An organization chart including the names of officers and the reporting structure of personnel associated with mortgage servicing activities. This chart should identify all divisions, staff members with titles, and reporting lines.

4.    A description of all of Nationstar's acquisitions of Mortgage Servicing Rights ("MSR") acquisitions in excess of $1 billion UPB since January 1, 2013, as well as a description of all MSR acquisitions currently in the pipeline.

5.    A list of third-party vendors, including but not limited to affiliates and companies that provide servicing and/or origination-related services to Nationstar, including but not limited to Solutionstar, New Residential Investment Corp., and Auction.com, and a description of the services provided by each company. For affiliated companies that provide such services to Nationstar, describe the relationship between such companies and Nationstar, and provide policies, practices, and procedures employed by Nationstar and the affiliated companies to avoid or mitigate potential conflicts of interest.

6.    Nationstar's policies, practices, and procedures with respect to approving a modification, short sale, or deed-in-lieu of foreclosure.

7.    Nationstar's form letter to borrowers approving a trial modification.

8.    Nationstar's policies, practices, and procedures with respect to onboarding loans transferred from another servicer, including but not limited to how Nationstar treats late payments from recently transferred borrowers.

9.    A list of New York loans in default or in foreclosure (where the Lis Pendens was filed). Please provide the following information in an Excel spreadsheet:

- Loan number
- The borrower's name (Last, First)
- Property Street
- City
- State
- Zip code
- Type of loan (First or Second Lien)
- Note Date
- Note Balance
- Note Maturity
- Escrow provision
- Whether the loan is serviced for a third party
- Date on which loan servicing was acquired
- Status of loan (delinquent, default, modified, in foreclosure, foreclosed, etc.)
- The current volume of loans serviced by Nationstar (number and UPB) that were not set up on Nationstar's servicing system before the first payment was due

*In addition, you will recall that in September 2013, Nationstar failed to fund 141 New York loans, apparently due to insufficient liquidity. Please provide a full explanation of the events that led to this liquidity shortfall and the steps that Nationstar has taken to ensure that this situation does not recur.*

47.     The NY DFS's probe continued throughout the Class Period and remains ongoing. The existence of the probe has a very material and detrimental impact on the Company's ability to continue practices the Company had formerly been undertaking to make its loan servicing business profitable, as Nationstar had to either correct its improper mortgage servicing practices or be precluded altogether from acquiring additional MSRs.  In response to the NY DFS's probe, the Company was compelled to thoroughly analyze its loan servicing practices and curtail its abusive practices.  Curtailing those practices – and taking on new practices required by regulators – necessarily rendered the Company's loan servicing business less profitable and at the same time made it impossible to post the profit that Nationstar budgeted when it purchased the MSR portfolios

during 2013 and 2014.  As a result, the value of those portfolios has declined and had to be written down.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

48.     The Class Period starts on February 27, 2014.  Before the market opened, Nationstar issued a release announcing its 4Q and FY 2013 financial results.  The Company reported FY 2013 net income of more than $217 million, or $2.40 per share, on revenue of more than $1.384 billion. In the release, defendants emphasized that the Company's servicing and Solutionstar segments were experiencing strong trends which were returning the Company to profitability, stating in pertinent part as follows:

> "I am very proud of what Nationstar was able to accomplish in 2013," said Jay Bray, Chief Executive Officer of Nationstar. "*We achieved strong growth in our servicing portfolio and originations volume*. We realized this growth while helping consumers with over 108,000 workouts and approximately 62,000 HARP refinancings. Nationstar delivered increased profitability and a healthy return on equity for our shareholders. In 2014, we continue to focus on delivering earnings growth and attractive returns to our shareholders as we expand our fee-based real estate services platform. *We are confident that we have the right culture, processes and infrastructure in place to serve our various stakeholders in 2014 and beyond*."

> Chief Financial Officer David Hisey said, "Nationstar delivered both impressive volume and top-line growth in 2013. *We expect in 2014 to enjoy the benefits of our substantial internal investments in infrastructure and efficiency improvements over the last year. Within servicing, we will look to increase profitability as we drive down our cost per loan, delinquencies, and vendor spend. We will continue to grow our Solutionstar business with organic volume growth at Nationstar and third-party business along with fee-based services acquisitions that meet our return thresholds.* Although origination margins came under pressure in the fourth quarter, *our current originations are profitable and we are confident this business will continue to be profitable in 2014 with its more focused footprint.*"

49.     Later that morning, Nationstar conducted an earnings conference call with analysts and investors to discuss the Company's 4Q 2013 and FY 2013 earnings and operations.  During the

conference call, defendants made additional false statements about the Company's business metrics and financial prospects. Defendants emphasized the profitability to be derived from the Company's ongoing MRS acquisitions, with defendant Bray stating in pertinent part as follows:

> In 2014, it's all about execution. ***We continue to believe we have significant upside from a profitability standpoint and achieve our 11 basis points for all of 2014. We're continuing to focus on acquisitions and are actively working our pipelines in total over $350 billion of servicing opportunities***.

50.     On May 8, 2014, Nationstar issued a release announcing its financial results for 1Q 2014. The Company reported net income of more than $24 million, or $0.27 per share, on revenue of $469.6 million. In the release, defendants emphasized that the Company's servicing and Solutionstar segments were experiencing strong trends which were returning the Company to profitability, stating in pertinent part as follows:

> "Nationstar delivered improved performance across all of our business lines in the first quarter," said Jay Bray, Chief Executive Officer. "After substantial growth in 2013, ***our 2014 focus is simple – continue to provide real solutions to homeowners and improve operating profitability and cash flow generation for our shareholders. In addition, we are executing on critical initiatives to drive long-term sustainability and growth.*** This includes our strategic acquisition of Real Estate Digital ("RED"), a fee-based real estate services company that provides online marketing, data, transaction management and digital media solutions. The acquisition accelerates our plan to offer a fully integrated digital marketplace that provides end-to-end services for every aspect of a real estate transaction. We welcome the RED employees to the Nationstar family."

> Chief Financial Officer David Hisey said, "***Our servicing segment continues to increase profitability by generating 7 basis points of operating profitability in the first quarter and is on track towards our 2014 goal of 11 basis points***. Reflecting momentum in our fee-based real estate services business, ***Solutionstar profitability grew at an impressive rate, with revenue increasing 22% and pretax income advancing 21%.*** In originations, we returned to operating profitability and reduced expenses by 37%. ***We expect to generate significant investable cash over the course of the year that can be deployed into high return opportunities***."

As to 2014 guidance, the release stated that "[r]eflecting external market conditions, Nationstar is providing updated 2014 guidance for AEBITDA per share of $12.00 - $12.75 and GAAP EPS of $4.00 - $5.00."

51.     Later that morning, Nationstar conducted an earnings conference call with analysts and investors to discuss the Company's 1Q 2014 earnings and operations.  Defendant Bray opened his remarks by providing what he characterized as the Company's "view[] on the overall condition and long-term outlook for the business," stating in pertinent part as follows:

> Before going into details on the quarter, we wanted to give our views on the overall condition and long-term outlook for the business. ***Internally we are executing on our goals that will ultimately lead to increased shareholder value.***
>
> ***In servicing, profitability is increasing each quarter as we execute on our strategic initiatives. In Solutionstar, we are growing the top and bottom line as we diversify its services and customer base***.
>
> In Solutionstar, we are growing the top and bottom line as we diversify its services and customer base.  In originations, we have right-sized the business and returned to profitability as we generate long-term servicing assets.  ***So we feel good about the operational direction of our business, we also are excited about the new opportunities in front of us.***
>
> In servicing, while the recent transfer pace has slowed, ***activity is still occurring and more importantly, the long-term pipeline of opportunities is very healthy. We are currently in dialogue with numerous banks who continue to express the desire to transfer servicing to entities that have a long track record of success in customer service and portfolio management. In fact, I feel better about the transfer outlook for the second half of the year in 2015 than I did last quarter***.

52.     On August 6, 2014, Nationstar issued a release announcing its financial results for 2Q 2014.  The Company reported net income of more than $66.6 million and EPS of $0.74, on revenue of $549.7 million.  Defendant Bray, emphasizing that the Company's servicing and Solutionstar segments were experiencing strong trends which were returning the Company to profitability, commented on the results, stating in pertinent part as follows:

- 20 -

> "*The continued execution of our strategic plan produced growth across all of our segments and key financial metrics . . . . Nationstar continues to deliver increasing profits and cash flows quarter over quarter by executing on our strategic initiatives*.  We are excited about the earnings power of our existing platforms as well as the continued build-out of our comprehensive digital real estate service offerings.  Our goal is to be the premier real estate services provider to residential owners, buyers, sellers, agents and investors."

As to 2014 guidance, the release stated that "Nationstar remain[ed] ahead of its 2014 budget and as a result [was] confirming its 2014 GAAP EPS guidance of $4.00 - $5.00."

53.     Later that morning, Nationstar conducted an earnings conference call with analysts and investors to discuss the Company's 2Q 2014 earnings and operations.  In his opening remarks, Defendant Bray stated in pertinent part that:

> [W]e have not changed our focus on execution with respect to the four key initiatives we've laid out at the end of last year.  Those areas … includes [sic] strong cash generation, increased Servicing profitability, investment and growth in Solutionstar, and continued improvement in our Origination operation.  *We have made significant progress in each of these areas.  And while there is much to be proud of, there's much more we can accomplish.*

54.     The statements made by defendants Nationstar, Bray and Stiles in ¶¶48-53 above were each materially false and misleading when made.  Nationstar shares traded at artificially inflated prices during the Class Period, reaching a Class Period high of nearly $38 per share in intraday trading on June 6, 2014.  The true facts which were then known or recklessly disregarded by defendants Nationstar, Bray and Stiles were:

(a)     Nationstar's deficiencies in management control and supervision rendered it unable to comply with laws and regulations applicable to servicing MSRs;

(b)     Nationstar was gouging mortgagors – and illegally enhancing its profits through unsustainable means – via illicit practices, such as charging for repeated, unnecessary

inspections, resulting in additional late payment fees, and by pressuring mortgagors to carry out expensive modifications and refinancing of their mortgages;

(c)     Solutionstar's increasing profitability was largely attributable to unlawful and inappropriate customer gouging, rather than improving business metrics;

(d)     Heightened regulatory scrutiny into MSR transferring and servicing – including a probe into Nationstar's own loan servicing practices launched by the NY DFS in March 2014 – had significantly increased Nationstar's costs of servicing MSRs and diminished the profitability and carrying value of the Company's MSR portfolio;

(e)     In order to deflect regulatory scrutiny in the wake of the regulatory enforcement actions taken against Ocwen, Nationstar had abandoned certain of its own abusive loan servicing practices, and adopted others required by regulators, which had made its loan servicing business less profitable and rendered Nationstar's MSR portfolio less valuable to the Company;

(f)     The adverse facts listed in (a)-(e) above were reasonably likely to have a material adverse effect on Nationstar's future revenue and operating results; and

(g)     As a result of (a)-(f) above, defendants lacked a reasonable basis to believe their Class Period statements about Nationstar, its business operations and its financial prospects.

55.     On November 6, 2014, Nationstar issued a release announcing its 3Q 2014 financial results for the period ended September 30, 2014.  The Company reported an 8.3% drop sequentially in 3Q 2014 revenue to $504.3 million, well short of the $568.8 million in revenue the Company had led the investment community to expect during the Class Period.  However, the Company did report quarterly net income of $111 million and EPS of $1.22, a 65% increase over the $67 million and EPS of $0.74 reported in 2Q 2014.  In addition to emphasizing that "*[t]hrough the first three*

*quarters of 2014 year-to-date, core earnings [were] up 27% compared to full year 2013 core earnings*," and stating that "Nationstar *continue[d] to see an increase in recurring fee-based earnings as a composition of overall earnings mix* with 70% of pretax income in the third quarter generated from servicing and Solutionstar, as compared to 60% in the second quarter," the release further attempted to mollify investors by quoting defendant Bray, stating in pertinent part as follows:

> "During the quarter, *we generated strong margins across all of our businesses, executed on our servicing segment profitability initiatives* and added additional third party clients within Solutionstar. We signed multiple servicing portfolio acquisitions and replaced virtually 100 percent of portfolio runoff in the quarter. As we announced earlier this week, we are pleased with the addition of Kal Raman as CEO of Solutionstar. This strategic hiring represents the continued evolution and growth at Solutionstar as we develop and deploy technology that will make the real estate experience easier and more transparent for consumers and real estate professionals."

56.    Defendants' positive statements had their intended effect and despite having disclosed a significant sequential revenue decline, the price of Nationstar common stock declined less than $8 per share to close at $27.87 per share on November 6, 2014, though on high trading volume of more than 5.4 million shares, more than eight and half times the average daily volume over the preceding ten trading days.

57.    On January 20, 2015, Nationstar was named in a civil lawsuit accusing the Company of racketeering in a putative class action filed in the Southern District of Florida, *Hill, et al. vs. Nationstar Mortgage LLC, et al.*, No. 15-cv-60106.  The four homeowners who filed suit alleged Nationstar was automatically charging, via one of its subsidiaries (Solutionstar), for continuous and unreasonable property inspections that essentially amounted to illegal kickbacks.  The mortgagors alleged that after becoming delinquent in their mortgage payments serviced by Nationstar, they were unjustly targeted by the Company's computer system for multiple fee-assessed property inspections carried out by Solutionstar.  They contend they were assessed additional late payment fees and

- 23 -

pressured to make costly modifications and refinancing transactions, in what amounts to racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Florida law. The plaintiffs further alleged that "[b]ecause Nationstar's parent companies profit from property inspections through their ownership of Solutionstar, Nationstar [was] incentivized to order property inspections even where they [were] excessive in frequency and price, unnecessary, inappropriate or otherwise unlawful."   The plaintiffs further alleged that Nationstar increased the fees it charged delinquent borrowers for property inspections in 2012 by more than 60% from $9.15 to $15, when Solutionstar was put in charge of executing them.  They also complained that the Company assessed multiple fee assessments within single-month periods, sometimes charging for multiple inspections conducted on the same day.

58.     Then on February 26, 2015, Nationstar issued a release announcing its financial results for its 4Q and FY 2014.  Rather than the EPS of $0.95 on revenue of $537.3 million Nationstar had led the market to expect based on its Class Period statements, the Company reported EPS of just $0.21 on revenue of just $449.4 million.  The Company blamed higher servicing expenses and increased amortization and reported a $46 million write-down on the value of its MSRs.

59.     In order to again prevent a free-fall in the market price of Nationstar common stock, the release quoted defendant Bray, who made positive statements about the Company's purportedly strong then-present business trends, stating in pertinent part as follows:

> "***Heading into 2015, growth prospects for Nationstar are significant, and we are well positioned from a capital, technology and operational perspective*** . . . .  Looking forward we believe customer satisfaction is a source of competitive advantage and a single customer provides extreme value to our portfolio over time. We are relentlessly focused on retaining our 'Customers for Life' through a robust

- 24 -

suite of products and solutions, offered at a competitive price, with a customer-centric focus."

60.     The Company also provided the following "Business Outlook" for 2015, again, purportedly based on then-present strong business trends:

**2015 Outlook**

**<u>Business Outlook</u>**

*Nationstar acquired most of its servicing assets at, or near, historic low valuations, improved the performance of the portfolios, cross-sold additional high-quality origination and ancillary services, and increased the value and stream of portfolio cash flows, enabling Nationstar to make additional investments in other accretive opportunities*.  Looking forward, we believe Nationstar is one of the best positioned servicers to acquire additional servicing portfolios based on this proven track record.  Ultimately, Nationstar's success depends on our ability to work productively with our customers, regulators and investors.

During the first quarter of 2015, Nationstar has entered into new commitments to acquire $35 billion of agency servicing assets, primarily from two counterparties.  Assuming a 12% annual run-off, we have already replenished 95% of the servicing annuity *and are well on our way to achieving our 10%, or greater, UPB growth target for the year.*  Transfer activity from both banks and non-banks has increased since the end of 2014, and is expected to remain elevated over the course of 2015 when compared against 2014. In addition to growing our servicing portfolio, *Nationstar continues to evaluate ways to improve efficiency, reduce delinquencies, strengthen the transfer process and increase overall profitability.*

61.     While defendants' comments had their intended effect and prevented a dramatic drop in the price of Nationstar common stock on February 26, 2015, the stock price dropped more than $4 per share, or over *13%*, to close at $27.05 per share, on unusually high trading volume of more than 4.9 million shares, almost eight times the average daily volume over the preceding ten trading days.

62.     The next day, on February 27, 2015, stock analyst Keefe, Bruyette & Woods issued a report further disclosing in pertinent part that:

Asset-Backed Alert is reporting that *Pimco, Blackrock, and MetLife, among bondholders, are pre-emptively warning [Nationstar] about making modifications on RMBS trusts they invest in. The bondholders are reportedly threatening that*

- 25 -

***they will sue [Nationstar] if it doesn't compensate them for modifications***.  The same group of bondholders, represented by Gibbs and Bruns, ***delivered a letter of non-performance to Ocwen last month***.

63.     The price of Nationstar common stock fell further following the Company's announcement on March 25, 2015 that it would be selling 17.5 million shares of its common stock to underwriters Citigroup, Barclays and JPMorgan for $28.49 per share, well below the $31.14 per share closing price on March 24, 2015.  The Company had disclosed on March 24, 2015 that it would acquire a portfolio of $25 billion additional MSRs from Ocwen covering nearly 142,000 residential MSRs on loans owned by Freddie Mac and Fannie Mae – a sale Ocwen was forced into as it faced delisting threats.  This was on top of a $9.8 billion portfolio of MSRs backed by Freddie Mac that Nationstar had purchased from Ocwen in February 2015.  And this was also in addition to Ocwen disclosing on March 24, 2015 that it had agreed to sell another $45 billion portfolio of MSRs on loans owned by Fannie Mae to JPMorgan, ***one of the underwriters in Nationstar's stock offering***, and a $9.6 billion portfolio of MSRs of loans owned by Freddie Mac to Green Tree Loan Servicing LLC.

64.     On this news, the price of Nationstar common stock fell more than $5 per share, or over ***16%***, to close below $26 per share, on unusually high trading volume of more than 12.8 million shares, more than 12 times the average daily volume over the preceding ten trading days.

65.     Finally, on May 5, 2015, before the opening of trading, Nationstar issued a release announcing its financial results for 1Q 2015.  Rather than the EPS of $0.70 on $514 million in revenue the defendants had led the market to expect, Nationstar reported a ***loss*** of $0.53 per share (compared to EPS of $0.21 in 1Q 2014), as the Company's revenue tumbled 15% year-over-year to $382 million, reflecting a 49% sequential plunge in quarterly revenue in its servicing segment to

$109 million.  Much of the loss came from a $110 million ($0.77 per share) write-down on the value of the Company's MSRs.  While Nationstar blamed the decline on lower interest rates causing higher pre-payments, as *Forbes* lamented that day that, in reality "heightened scrutiny into the servicing space by regulators such as the Benjamin Lawsky-headed New York Department of Financial Services" had significantly diminished profits in and the carrying value of the Company's servicing business.  Stock analyst Sterne Agee lamented that the "'primary drivers behind the weaker quarter included a decline in contribution from Solutionstar and higher amortization & other related cost at the servicing unit.'"

66.     On this news, the price of Nationstar common stock again plummeted on May 5, 2015, declining $6.66 per share, or ***more than 25%***, on unusually high trading volume of more than ten million shares, 13 times the average daily volume of the prior ten trading days.

67.     The market for Nationstar common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Nationstar common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Nationstar common stock relying upon the integrity of the market price of Nationstar common stock and market information relating to Nationstar, and have been damaged thereby.

68.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Nationstar common stock, by publicly issuing false and misleading statements and omitting material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading because they

failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

69.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Nationstar's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Nationstar and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

70.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents in violation of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Nationstar, their control over, and/or receipt and/or modification of Nationstar's allegedly

materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

71.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

72.     The Individual Defendants, because of their positions with Nationstar, controlled the contents of the Company's public statements during the Class Period.  Each Individual Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of these defendants is responsible for the accuracy of Nationstar's corporate statements and is therefore responsible and liable for the representations contained therein.

## LOSS CAUSATION/ECONOMIC LOSS

73.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Nationstar common stock and operated as a fraud or deceit on Class Period purchasers of Nationstar common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior

misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Nationstar common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

74.     As a result of their purchases of Nationstar common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Nationstar common stock to trade at artificially inflated prices throughout the Class Period.

75.     By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of Nationstar's business and prospects.  When the truth about the Company was revealed to the market, the price of Nationstar common stock fell significantly.  This decline removed the inflation from the price of Nationstar common stock, causing real economic loss to investors who had purchased Nationstar common stock during the Class Period.

76.     The decline in the price of Nationstar common stock after the corrective disclosures came to light was a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Nationstar common stock negate any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.

77.     The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Nationstar common stock and the subsequent significant decline in the value of Nationstar common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET DOCTRINE**

78.     At all relevant times, the market for Nationstar common stock was an efficient market for the following reasons, among others:

(a)     Nationstar common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient stock market;

(b)     as a regulated issuer, Nationstar filed periodic public reports with the SEC and the NYSE;

(c)     Nationstar regularly communicated with public investors via established market communication mechanisms, including regular dissemination of releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Nationstar was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

79.     As a result of the foregoing, the market for Nationstar common stock promptly digested current information regarding Nationstar from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Nationstar common stock during the Class Period suffered similar injury through their purchase of Nationstar common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

80.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, they were not accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Nationstar who knew that those statements were false when made or the speaker did not have a reasonable basis to make such statements.

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

81.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.    During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

83.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

84.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Nationstar common stock.  Plaintiff and the Class would not have purchased Nationstar common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

85.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Nationstar common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

86.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.     The Individual Defendants acted as controlling persons of Nationstar within the meaning of §20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Nationstar, and their ownership of Nationstar common stock, the Individual Defendants had the power and authority to cause Nationstar to engage in the wrongful conduct complained of herein.  Nationstar controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead

Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil

Procedure and plaintiff's counsel as Class Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members

against all defendants, jointly and severally, for all damages sustained as a result of defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  June 2, 2015                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                        PAUL J. GELLER
                                        Florida Bar No. 984795
                                        JACK REISE
                                        Florida Bar No. 058149
                                        ELIZABETH A. SHONSON
                                        Florida Bar No. 22282


                                        _____
                                                s/ JACK REISE

- 34 -

120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
jreise@rgrdlaw.com
eshonson@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff