UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 15-61170-Civ-DIMITROULEAS

| | |
|---|---|
| CITY OF ST. CLAIR SHORES POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, ) ) ) | CLASS ACTION |
| Plaintiff, ) ) | |
| vs. ) ) | |
| NATIONSTAR MORTGAGE HOLDINGS INC., et al., ) ) ) | |
| Defendants. ) ) ) | |

**AMENDED COMPLAINT FOR**
**<u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ..........................................................................................................1

II.     NATURE OF THE ACTION ......................................................................................2

III.    JURISDICTION AND VENUE ..................................................................................4

IV.     PARTIES .......................................................................................................................5

        A.      Plaintiffs ...........................................................................................................5

        B.      Defendants ........................................................................................................6

                1.      Exchange Act Defendants.....................................................................6

                2.      Securities Act Defendants....................................................................7

V.      FACTUAL BACKGROUND APPLICABLE TO ALL CLAIMS ..................................8

VI.     SECURITIES ACT VIOLATIONS..............................................................................12

        A.      Nationstar Conducts The Offering....................................................................12

        B.      The Securities Act Defendants' Untrue Or Misleading Statements And
                Omissions Of Material Facts ............................................................................13

                1.      The Offering Materials Contained Affirmatively False And Misleading
                        Statements ...........................................................................................14

                2.      The Offering Materials Omitted Information That Was Required To
                        Be Disclosed Under Item 303 ............................................................17

                3.      The Offering Materials Omitted Information That Was Required To
                        Be Disclosed Under Item 503 ............................................................18

        C.      Class Action Allegations Applicable To The Securities Act Claims ...................19

        D.      Causes Of Action Under The Securities Act ......................................................21

VII.    EXCHANGE ACT VIOLATIONS ..............................................................................25

        A.      As Interest Rates Declined, The Exchange Act Defendants Touted
                Nationstar's Originations Segment And Its Key Metrics .....................................26

        B.      These Key Metrics Were Materially Misleading And Not Indicative Of The
                Company's Ability To Generate Revenues From The Originations Segment ......30

        C.      The Exchange Act Defendants' Statements Were Materially False And
                Misleading Statements And/Or Omitted Material Facts........................................31

        D.      The Truth Concerning The Exchange Act Defendants' Conduct Is Revealed ......35

        E.      The Exchange Act Defendants' Scienter ............................................................37

        F.      Loss Causation For The Exchange Act Claims ..................................................39

        G.      The Presumption Of Reliance Applies ..............................................................41

        H.      The Statutory Safe Harbor And Bespeaks Caution Doctrine Are Inapplicable.....43

**Page**

      I.      Class Allegations Applicable To The Exchange Act Claims ................................44

      J.      Causes Of Action Under The Exchange Act ........................................................46

VIII.   PRAYER FOR RELIEF ..................................................................................................51

IX.     JURY TRIAL DEMANDED ...........................................................................................51

## I.       INTRODUCTION

1.       Lead Plaintiffs Oklahoma Firefighters Pension & Retirement System ("OFP"), City of Taunton Contributory Retirement System ("City of Taunton"), and Southeastern Pennsylvania Transportation Authority Consolidated Pension Plan ("SEPTA") (collectively, the "Lead Plaintiffs") and additional named plaintiffs Pembroke Pines Firefighters and Police Officers Pension Fund ("Pembroke") and Shawn Ghatan, as Trustee of the SDG Trust ("Ghatan") (the "Additional Named Plaintiffs," and together with Lead Plaintiffs, "Plaintiffs") make the following allegations against defendants:  (i) Nationstar Mortgage Holdings Inc. ("Nationstar" or the "Company"); (ii) Jesse K. Bray ("Bray"); (iii) David C. Hisey ("Hisey"); and (iv) Robert D. Stiles ("Stiles") (collectively, the "Exchange Act Defendants") for violations of §§ 10(b) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5, on their own behalf and on behalf of a class (the "Class") consisting of all persons who purchased or otherwise acquired Nationstar common stock from May 8, 2014 through May 4, 2015 (the "Class Period").[1]

2.       Plaintiffs separately assert claims under §§ 11, 12(a)(2), and/or 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o against Defendants Nationstar, Bray, Stiles, Robert H. Gidel ("Gidel"), Brett Hawkins ("Hawkins"), Michael D. Malone ("Malone"), and the Underwriter Defendants (defined below) (collectively, "the Securities Act Defendants") on their own behalf and on behalf of all persons or entities who purchased shares in a secondary public offering (the "Offering") of 17,500,000 shares of Nationstar common stock (the "Securities Act Class") issued and sold pursuant to a registration statement on Form S-3 (File No.

---

[1] All emphasis herein is added unless otherwise noted.

333-18872), as amended by Post Effective Amendment No. 1 filed with the SEC on February 27, 2015 (the "Registration Statement"), including an accompanying preliminary prospectus filed therewith ("Preliminary Prospectus"), and a preliminary prospectus supplement ("Preliminary Prospectus Supplement") and final prospectus supplement ("Prospectus") filed pursuant to Rule 424(b) of the Securities Act with the SEC on March 25 and March 26, 2015.  The Registration Statement, Preliminary Prospectus, Preliminary Prospectus Supplement, Prospectus, and all documents incorporated by reference, are hereafter referred to as the "Offering Materials."  The fraud-based Exchange Act allegations and strict-liability and negligence-based Securities Act allegations are separately presented because the latter cannot be said to, and do not, sound in fraud.

3.      Except as to allegations specifically pertaining to Plaintiffs and Plaintiffs' counsel, the allegations herein are based upon a continuing investigation undertaken by Plaintiffs' counsel, under Plaintiffs' supervision, into the facts and circumstances alleged herein including, without limitation, review and analysis of:  (i) Nationstar's filings with the SEC; (ii) securities analysts' reports concerning Nationstar; (iii) Nationstar's press conferences, investor and analyst conference calls, and corresponding transcripts thereof; (iv) press releases and media publications disseminated by Defendants and non-parties; (v) media and industry reports and other publications concerning Nationstar and/or the other Defendants; (vi) interviews with factual sources, including individuals formerly employed by the Company and its subsidiaries; and (vii) Nationstar's corporate website.  Plaintiffs believe that additional evidentiary support for the allegations herein will likely emerge after a reasonable opportunity to conduct discovery.

## II.      NATURE OF THE ACTION

4.      Nationstar is one of the largest non-bank residential mortgage servicers in the United States, servicing 2.3 million customers as of December 31, 2014.  Nationstar conducts its business through three operating segments:  Servicing, Originations, and Solutionstar.

5.      The Securities Act Claims alleged herein arise out of Nationstar's raising of approximately $500 million from investors through a common stock offering that commenced just days before the end of the first fiscal quarter of 2015 ("1Q15").  At the time of the Offering, Nationstar was operating in a declining interest rate environment that negatively impacted the Company's principal asset—Mortgage Servicing Rights ("MSRs")—which were susceptible to devaluation as a result of projected and actual principal prepayments from refinancings.  In the Offering Materials, Nationstar assured investors that any negative impact on the Company's MSR portfolio due to declining interest rates was being ***offset*** by an equal and "favorable" impact on the Originations segment because this very same declining interest environment was spurring a surge of new originations.  The Offering Materials falsely conveyed to investors that the Company's overall financial results would not be impacted negatively by the declining interest rate environment.  Accordingly, analyst consensus estimates for the Company for 1Q15 were net earnings of $0.71 per share.  Yet, at the time the Offering was made, Nationstar was poised to record a massive writedown of its MSRs that would eviscerate its 1Q15 earnings.  In fact, rather than record a profit for the quarter, Nationstar reported a massive net loss of $0.53 per share ($48.3 million) driven by a $115 million writedown in the value of its MSRs.

6.      Separately, with respect to the Exchange Act claims, Plaintiffs allege that the Exchange Act Defendants issued materially misleading statements to investors designed to create the perception of growth in the Company's Originations segment.  To this end, the Exchange Act Defendants repeatedly touted certain "key metrics" to investors, which they claimed to be indicators of that growth and opportunity for profit.  These key metrics included, among others, "locked pipeline" and "application volume," which Defendants represented to be robust sources of future revenues for the Company.

- 3 -

7.      Yet, the "locked pipeline" and "application volume" figures that Nationstar reported to the market throughout the Class Period were materially misleading because they included an increasing number of potential loans that Nationstar knew were extremely unlikely to ever be funded.  This was particularly materially misleading in light of the Company's repeated statements touting its ability to generate revenues through the Originations segment to counterbalance the negative impact of declining interest rates on its Servicing division, and its overly optimistic financial guidance, which it continually reaffirmed throughout the Class Period.  The truth regarding the Company's inability to offset its declining Servicing business with growth in its Originations business was partially disclosed on February 26, 2015 when, before the market opened, the Company released its earnings for the fourth quarter ("4Q14") and fiscal year ended December 31, 2014 ("FY14").  While the market's consensus estimate was that Nationstar would earn $0.91 per share during 4Q14, the Company reported earnings of just $0.58 per share, which was due in part to the Originations segment's inability to make up for losses suffered by the Servicing unit.  Yet, even with this partial disclosure, the Company touted its Originations volume metrics, claiming that it had the most record lock days of its history during 4Q14.  Then, on May 5, 2015, before the open of trading, the Company released its 1Q15 results, reporting losses of $0.53 per share ($48.3 million), despite consensus analyst estimates of profits of $0.71 per share.  The stock collapsed by 25%, from $26.17 per share to $19.51 per share.

## III.     JURISDICTION AND VENUE

8.      Jurisdiction is conferred by § 27 of the Exchange Act and § 22 of the Securities Act.  The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, §§ 11, 12(a)(2) and 15 of the Securities Act.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, § 27 of the Exchange Act and § 22 of the Securities Act.

9.      Venue is proper in this District pursuant to § 27 of the Exchange Act, and 28 U.S.C. § 1391(b), and § 22 of the Securities Act (15 U.S.C. §77v).  Certain of the acts, practices and transactions complained of herein, including the dissemination of materially false and misleading information, occurred in this District.

10.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

IV.    **PARTIES**

A.    **Plaintiffs**

11.     Lead Plaintiff OFP is a pension fund based in Oklahoma that administers the retirement fund for Oklahoma's active and retired paid and volunteer firefighters.  OFP has approximately $2.1 billion in assets under management.  As reflected in its certification filed previously in this action (ECF No. 15-1), OFS purchased shares of Nationstar's common stock during the Class Period and has been damaged as a result of the conduct complained of herein.

12.     Lead Plaintiff City of Taunton is a public employee contributory retirement system in Massachusetts that serves over 1,400 city employees (excluding teachers) and over 800 retirees and survivors.  City of Taunton is responsible for maintaining approximately $270 million in pension assets.  As reflected in its certification filed previously in this action (ECF No. 15-1), City of Taunton purchased shares of Nationstar's common stock during the Class Period and has been damaged as a result of the conduct complained of herein.

13.     Lead Plaintiff SEPTA is as defined benefit pension plan, headquartered in Philadelphia, Pennsylvania, which provides retirement and other specified benefits to approximately 13,500 beneficiaries.  SEPTA oversees more than $1.1 billion in assets.  As reflected in its

certification filed previously in this action (ECF No. 15-1), SEPTA purchased shares of Nationstar's common stock during the Class Period and has been damaged as a result of the conduct complained of herein

14.     Additional Named Plaintiff Pembroke is a fund that provides pension and disability benefits to its participating members, including both active and retired firefighters, police officers, and their beneficiaries.  Pembroke has approximately $436 million in assets under management.  As reflected in the certification attached hereto as Exhibit A, Pembroke purchased shares of Nationstar's common stock during the Class Period and has been damaged as a result of the conduct complained of herein.

15.     Additional Named Plaintiff Ghatan is the Trustee for the SDG Trust, which, as reflected in the certification attached hereto as Exhibit B, purchased shares of Nationstar's common stock during the Class Period, including shares pursuant or traceable to the Offering, and has been damaged as a result of the conduct complained of herein.

**B.     Defendants**

**1.     Exchange Act Defendants**

16.     Defendant Nationstar is a Delaware corporation with a principal place of business located at 8950 Cypress Waters Blvd, Coppell, TX 75019.

17.     Defendant Bray is, and was at all relevant times, Nationstar's Chief Executive Officer ("CEO") and a member of Nationstar's Board of Directors.  Bray previously served as Nationstar's Executive Vice President and Chief Financial Officer ("CFO") from May 2011 to February 2012.  In addition, he has served as:  (i) the President of Nationstar's wholly owned subsidiary, Nationstar Mortgage LLC, since July 2011; (ii) the CEO of Nationstar Mortgage LLC since October 2011; (iii) the CFO of Nationstar Mortgage LLC from the time he joined Nationstar in May 2000 until

September 2012; (iv) a Manager of Nationstar Mortgage LLC since October 2011; and (v) a director of another subsidiary, Nationstar Capital Corporation, since March 2010.

18.     Defendant Hisey was Nationstar's Executive Vice President and CFO until May 2014.

19.     Defendant Stiles is, and has been since May 2014, Nationstar's Executive Vice President and CFO.  Stiles also serves as Executive Vice President and CFO at Solutionstar, which he joined in January 2013, and at Nationstar Mortgage LLC, where he has served as Executive Vice President since May 2013.  From 2009 until 2012, Stiles served as the CFO of Altisource Portfolio Solutions, S.A., a publicly traded real estate solutions provider that was spun-off from Ocwen Financial Corporation ("Ocwen").

## 2.     Securities Act Defendants

20.     Plaintiffs assert non-fraud claims under the Securities Act against Nationstar and Bray and Stiles, each of whom signed the Registration Statement, along with the additional Defendants listed below.

21.     Defendant Gidel served on Nationstar's Board of Directors during the Class Period. As alleged below, during the Class Period, Gidel signed the Company's Registration Statement for the Offering.

22.     Defendant Hawkins served on Nationstar's Board of Directors during the Class Period.  As alleged below, during the Class Period, Hawkins signed the Company's Registration Statement for the Offering.

23.     Defendant Malone served on Nationstar's Board of Directors during the Class Period. As alleged below, during the Class Period, Malone signed the Company's Registration Statement for the Offering.

24.     Defendant Barclays Capital Inc. ("Barclays") was a co-lead underwriter of and seller in the Offering.  As an underwriter of the Offering, Barclays was responsible for ensuring the truthfulness and accuracy of the Offering Materials.  Barclays sold 5,833,334 shares of Nationstar common stock in the Offering at the offering price of $28.49 per share.

25.     Defendant Citigroup Global Markets Inc. ("Citigroup") was a co-lead underwriter of and seller in the Offering.  As an underwriter of the Offering, Citigroup was responsible for ensuring the truthfulness and accuracy of the Offering Materials.  Citigroup sold 5,833,334 shares of Nationstar common stock in the Offering at the offering price of $28.49 per share.

26.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was a co-lead underwriter of and seller in the Offering.  As an underwriter of the Offering, J.P. Morgan was responsible for ensuring the truthfulness and accuracy of the Offering Materials.  J.P. Morgan sold 5,833,334 shares of Nationstar common stock in the Offering at the offering price of $28.49 per share.

27.     Defendants Barclays, Citigroup and J.P. Morgan are referred to herein as the "Underwriter Defendants."  Defendants Nationstar, Bray, Stiles, Gidel, Hawkins, Malone and the Underwriter Defendants are collectively referred to herein as the "Securities Act Defendants."

## V.     FACTUAL BACKGROUND APPLICABLE TO ALL CLAIMS

28.     Formed in 2011 and headquartered in Coppell, Texas, Nationstar is one of the largest non-bank residential mortgage servicers in the United States, servicing 2.3 million customers with an aggregate outstanding unpaid principal balance ("UPB") of more than $381.1 billion as of December 31, 2014.  Nationstar conducts its business through three operating segments:  Servicing, Originations, and Solutionstar.

29.     Servicing, which comprises 70% of Nationstar's business, primarily involves loan administration, payment processing, mortgage escrow account administration, collection of insurance premiums, response to homeowner inquiries, loss mitigation solutions, including loan

modifications, and supervision of foreclosures and property dispositions on behalf of the owners of the loans.

30.     Nationstar's Servicing segment primarily acquires portfolios of MSRs, and earns revenue through fees, which are generally expressed as basis points of the outstanding UPB of the loans that it services.  The UPB of Nationstar's servicing portfolio increases when the Company acquires additional MSRs and decreases when borrowers make normal monthly principal payments. Prepayment speed, which is the measurement of how quickly UPB is reduced, has a significant impact on the profitability of Nationstar's MSRs.  Specifically, when prepayment speeds increase (either through increased principal pay-downs or refinancings), the expected life of Nationstar's MSRs, and thus their value, decline.  As the purchase price of MSRs is based on assumptions of interest rate movements, when interest rates are decreasing, the principal asset of the Company begins to deteriorate as anticipated revenues from the asset erode.  This necessitates mark-to-market writedowns, which are reflected in earnings.  Thus, in a declining interest rate environment, the ability of Nationstar to increase the size of its MSR portfolio becomes critically important for its investors.

31.     Through its Originations segment, Nationstar originates conventional residential mortgages.  In particular, the Company focuses its originations efforts primarily on "re-origination," which involves Nationstar actively working with its existing servicing customers to refinance their mortgage loans.  By re-originating loans for these existing customers, the Company can retain the associated MSRs (which would be lost if the borrower refinanced with another lender), thereby extending the longevity of the servicing cash flows.  Nationstar refers to the process of refinancing loans within its MSR portfolio as "recapture."   During the Class Period, Nationstar touted its platform for originations as a competitive strength based upon its purported capacity to recapture

loans, thereby replenishing the Company's MSR portfolio and mitigating the impact of prepayments and writedowns of MSRs.

32.     The profitability of Nationstar's Servicing and Originations segments are subject to material risks related to changes in prevailing interest rates.  Specifically, Nationstar's servicing portfolio is comprised of both credit-sensitive MSRs, which the Company has primarily acquired through bulk acquisitions, and interest-rate-sensitive MSRs, which principally consist of MSRs that the Company has obtained through "flow transactions" (i.e., arrangements whereby loan originators agree to sell excess MSRs on a recurring basis on newly originated loans) or from its origination activities.  As the Company acknowledges in its 2014 Form 10-K,  "[f]or MSRs marked at fair value that are interest rate sensitive, servicing values are typically correlated to interest rates such that when interest rates *rise*, the value of the servicing portfolio also increases principally as a result of lower prepayments."   Conversely, "[t]he loan origination market is sensitive to interest rate movements as typically loan applications increase as interest rates *fall*."

33.     Accordingly, the 2014 Form 10-K identifies a *decrease* in prevailing interest rates as a material risk to Nationstar's Servicing segment because it may, among other things:  (i) "increase prepayment speeds causing our servicing fees to decline more rapidly than anticipated and we may record a decrease in the value of our MSRs;" and (ii) "lead to higher compensating interest expense and increased amortization expense as we revise downward our estimate of total expected income as prepayment speeds increase."   By contrast, the 2014 Form 10-K also identifies an *increase* in prevailing interest rates as a material risk to Nationstar's Originations segment insofar as it could, among other things, "adversely affect our loan originations volume because refinancing an existing loan would be less attractive for homeowners and qualifying for a purchase money loan may be more difficult for consumers."

34.    Throughout 2014, the prevailing interest rates were in a steady state of decline, as depicted in the chart below showing the yield on 10-year Treasury notes, which are highly correlated with mortgage rates:



35.    Given this trend, Nationstar's ability to offset the adverse impact of the interest rate environment on its servicing business through growth in its originations business was critical to what the Company's posited to investors as its "growth story."  Indeed, in the Company's investor presentation for the fourth quarter and full year ended December 31, 2013 accompanying its earnings conference call with analysts and investors held on February 27, 2014, Defendants pointed to Nationstar's originations business as a "cost-effective and profitable means to generate servicing assets" using a "[p]latform designed to sustain [the Company's] servicing portfolio through replenishment."  As Defendant Bray further explained on the call: "Our overarching strategy for our Originations segment remains unchanged: generate long-term servicing assets at a profit that will supplement and sustain our servicing portfolio.  Our portfolio remains rich with refinance opportunity.  And we are right-sizing the operations for 2014 volume expectations."

## VI.    SECURITIES ACT VIOLATIONS

36.    The claims in Counts I-III are brought pursuant to §§ 11, 12 and 15 of the Securities Act.  These claims are based solely on strict liability and negligence, and are not based on any knowing or reckless conduct by or on behalf of Securities Act Defendants – i.e., they do not allege, and do not sound in, fraud – and Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in connection with these non-fraud claims.

### A.    Nationstar Conducts The Offering

37.    On or about March 30, 2015, Nationstar completed an Offering of 17,500,000 shares of common stock at a price of $28.49 per share.  In connection with the Offering, Nationstar filed its Registration Statement and Preliminary Prospectus on February 27, 2015.  Thereafter, Nationstar filed the Preliminary Prospectus Supplement and Prospectus on March 25 and March 26, 2015, respectively.  Pursuant to the Offering Materials, the Company issued and sold 17,500,000 shares of Nationstar common stock to the Underwriter Defendants, each of which was sold 5,833,334 initial shares and granted 30 day option to purchase up to an additional 2,625,000 shares of Nationstar common stock.  In exchange, the Company reaped gross proceeds of approximately $500 million from the Offering.

38.    On March 25, 2015, six days before the close of the fiscal first quarter, Nationstar issued a press release announcing the purpose and the pricing of the Offering.  Specifically, the Company disclosed that subject to the successful completion of the Offering, Nationstar intended to use the net proceeds for general corporate purposes, including future acquisitions, transfers of servicing portfolios, funding of advances and repayment of obligations.  According to the Company, the acquisitions were "expected to include the acquisition of $60 billion unpaid principal balance of mortgage servicing rights in process or under letters of intent as of the date of the prospectus

- 12 -

supplement, the consummation of which is subject to definitive documentation, regulatory approvals, and/or other customary conditions."

39.     Among other things, the Offering Materials described Nationstar's business, set forth its financial results, discussed the drivers of those results and projections, and provided the terms of the Offering.  The Offering Materials incorporated by reference, among other things, the Company's Form 10-K for the fiscal year ended December 31, 2014 ("2014 Form 10-K").  The Offering Materials also stated that information Nationstar later filed with the SEC would "automatically update and supersede information contained in or previously incorporated by reference into this prospectus supplement."  In this regard, the Company expressly incorporated by reference "any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") on or after the date of this prospectus supplement and before the termination of the offering of the securities covered by this prospectus supplement[.]"  Nationstar also expressly incorporated any public filing with the SEC post-dating the Offering Materials, including its quarterly reports on Forms 10-Q, and current reports on Forms 8-K, which updated and became part of the Registration Statement.

40.     The Registration Statement was signed by Nationstar, Brey, Stiles, Gidel, Hawkins and Malone.

**B.     The Securities Act Defendants' Untrue Or Misleading Statements And Omissions Of Material Facts**

41.     The Offering Materials contained untrue and/or misleading statements and omissions of material facts and trends that had or were reasonably likely to have a material impact the Company's financial condition:

(a)     <u>First</u>, the Offering Materials contained a series of statements that purported to warn investors that changes in the prevailing interest rates associated "may" negatively affect its Servicing revenues.  Relatedly, the Offering Materials assured investors that to the extent such changes were negatively impact the Company's Servicing segment

during the first quarter of 2015, that negative impact was being "offset" by an equally "favorable" impact to the Originations segment. These statements were materially misleading because, in fact, by the time of the Offering on March 26, 2015, it was reasonably likely that the declining interest rates would have (or had already) a material negative impact on Nationstar's revenues and key financial metrics for the first quarter 2015, and that the losses Nationstar was suffering in its Servicing segment materially exceeded any purported favorable impact on the Originations segment.

(b)     Second, the Offering Materials failed to disclose the information required by Item 303 of Regulation S-K, 17 CFR 229.303 ("Item 303"), which required the Offering Materials to disclose that the deteriorating interest rate environment was having a material negative impact on its revenues during the first quarter of 2015, and the magnitude of that impact.

(c)     Third, in violation of Item 503 of SEC Regulation S-K, 17 CFR 229.503 ("Item 503"), the Offering Materials failed to adequately alert investors to the actual impact that Nationstar's Servicing segment was having on its overall financial results for the first quarter of 2015, including, *inter alia*, the fact that, during the first quarter, the Servicing segment's acute sensitivity to the interest rate environment was not being "offset" by increased Originations, and was causing a decline in the fair market value of its MSRs.

**1.     The Offering Materials Contained Affirmatively False And Misleading Statements**

42.     In the section of the 2014 Form 10-K called "Risk Factors," the Securities Act Defendants purported to warn investors that "[o]ur earnings *may* decrease because of changes in prevailing interest rates," but offered only a generalized reference to the *possibility* that changes in prevailing interest rates could *potentially* impact the Company's earnings:

Our profitability is directly affected by changes in prevailing interest rates. The following are certain material risks we face related to changes in prevailing interest rates:

- an increase in prevailing interest rates *could* generate an increase in delinquency, default and foreclosure rates resulting in an increase in both operating expenses and interest expense and could cause a reduction in the value of our assets;
- an increase in prevailing interest rates *could* adversely affect our loan originations volume because refinancing an existing loan would be less attractive for homeowners and qualifying for a loan may be more difficult for consumers;

- an increase in prevailing interest rates would increase the cost of servicing our outstanding debt, including our ability to finance servicing advances and loan originations;
- a decrease in prevailing interest rates *may* increase prepayment speeds causing our servicing fees to decline more rapidly than anticipated and we may record a decrease in the value of our MSRs;
- a decrease in prevailing interest rates *may* lead to higher compensating interest expense and increased amortization expense as we revise downward our estimate of total expected income as prepayment speeds increase; and
- a decrease in prevailing interest rates *could* reduce our earnings from our custodial deposit accounts.

43.     In the section of the 2014 Form 10-K called "Quantitative and Qualitative Disclosures about Market Risk," the Securities Act Defendants made similar, generic representations concerning the potential impact of changes in the prevailing interest rates on its MSR values.  For example, with respect to the Servicing segment, Nationstar stated only that "a decrease (increase) in interest rates would generally increase (decrease) prepayment rates and *may* require us to report a decrease (increase) in the value of our MSR."

44.     Further, in a section of the Offering Materials called the "Update on First Quarter 2015," Nationstar purported to provide investors information concerning its financial performance between January 1, 2015 and March 26, 2015.  However, within this section, which was published just three business days prior to the close of the first quarter, Nationstar represented that to the extent lower interest rates were negatively impacting its Servicing segment during the quarter, such impact was merely "*offset[ting]*" what "continued to be [a] favorable" environment for its Originations segment:

- 15 -

Year to date, the prevailing interest rate environment continued to be favorable for our Originations segment offset by elevated prepayments when compared year over year. The level of interest rates is an important driver of the results of our business, with continued lower interest rates negatively affecting our Servicing segment and positively affecting our Originations segment. The foregoing is solely as of the date of this prospectus supplement, and our actual results for the quarter ended March 31, 2015 may differ materially as a result of our performance for the remainder of the quarter as well as the completion of our financial closing procedures, final adjustments and other developments that may arise between now and the time the financial results for our first quarter are finalized.

45.     Each of the statements set forth in ¶¶42-44 was materially untrue and misleading as of the date of the Offering.  Contrary to the Offering Materials' representation that any deterioration in the interest rate environment *might* negatively impact Nationstar's revenue and financial condition, by the time of the Offering:  (i) the interest rate environment was  having a deleterious impact on the Company's financial results for the first quarter of 2015 by, among other things, negatively impacting the mark-to-market value of Nationstar's MSRs, prepayment rates, amortization and the overall revenues derived from Servicing; and (ii) Nationstar was going to record a massive loss for the first quarter.

46.     Likewise, by characterizing the interest rate environment as "favorable" and representing that there had been an "offset" between negative and positive impacts caused by that environment, the Offering Materials falsely indicated that any declines within the Company's Servicing segment resulting from decreasing interest rates had been balanced out, if not overcome, by gains within the Originations segment.  In reality, however, the losses in Nationstar's Servicing segment were reasonably likely to materially exceed any purported "favorable" benefits realized by the Originations segment, leading to a historically large first quarter loss for the Company.

47.     Further demonstrating the untrue and/or misleading nature of these statements, for the first quarter of 2015, which ended *just one day after* the Offering was completed, the Company reported a net loss of $0.53 per share ($48.3 million), primarily due to the impact of declining

interest rates on its MSR portfolio.  By comparison, the Company's net income for the entire 2014 was approximately $221 million.  This loss, which was a material departure from the market's consensus estimate of a ***profit of $0.71 per share***, revealed that gains within the Originations segment had not, in fact, offset the losses suffered by the Servicing segment.

**2.      The Offering Materials Omitted Information That Was Required To Be Disclosed Under Item 303**

48.      The Offering Materials also omitted material information required by Item 303 of Regulation S-K.  Item 303 requires the disclosure of all "known trends … that have had or that the registrant reasonably expects will have a material … unfavorable impact on … revenues."  In addition to the identification of such "known trends," Item 303 specifically requires disclosure of: (i) whether those trends have had or are reasonably expected to have a material negative impact on revenue; and (ii) the extent of any such impact on revenue.

49.      Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 require disclosure of forward-looking information."  Indeed, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company … with particular emphasis on the registrant's prospects for the future."  *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See* Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

- 17 -

50.     Disclosure of forward-looking information concerning the registrant's revenue is required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operations."  *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

51.     By the time of the Offering, both the deteriorating interest rate environment and the Company's reduction in its locked pipeline were reasonably likely to—and likely already were—negatively impacting the Company's first quarter financial condition and results of operations, as reflected by the $48 million net loss that Nationstar suffered in the first quarter, which ended a day after the Offering was completed.  Indeed, while—after the Offering—Bray attributed Nationstar's first quarter loss to a sudden decline in interest rates and unexpected prepayments, in fact, average 10-year Fixed Mortgage rates had started the first quarter at 2.123%% and ended at 1.934%.

52.     Accordingly, the Offering Materials' failure to disclose: (i) the fact that the deteriorating interest rate environment was reasonably like to have (or were already having) a "material … unfavorable impact on … revenues" for the first quarter of 2015, and (ii) the magnitude of this unfavorable impact, constitutes a violation of Item 303 and renders the Offering Materials materially false and misleading.

### 3.    The Offering Materials Omitted Information That Was Required To Be Disclosed Under Item 503

53.     Likewise, the Offering Materials failed to comply with Item 503, which requires Offering Materials to include, among other things, a "discussion of the most significant factors that make the offering speculative or risky."  Here, one of the most significant factors that made the Offering speculative or risky to investors was the fact that, at the time of the Offering, Nationstar

was just days away from booking a $0.53 per share loss, when the market consensus was that the Company would report a $0.71 gain.  Likewise, another significant risk facing investors in the Offering was the risk that, in a declining interest rate environment, Nationstar's Originations segment would be unable to make up for declines in the performance of its Servicing segment. Nowhere within the Offering Materials, particularly in the purported update on the first quarter of 2015, did Nationstar disclose to investors that, as of the date of the Offering, the Company was poised to report lower-than-expected earnings for the first quarter and that the negative impact of the interest rate environment on the Servicing segment would not be offset in full by the Originations segment.

54.     Accordingly, disclosure of these material facts was required under Item 503.

55.     Nationstar's common shares were sold in the Offering at $28.49 per share and as of the filing of Plaintiffs' Securities Act claims were trading at $14.29 per share.

**C.      Class Action Allegations Applicable To The Securities Act Claims**

56.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) individually and on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Nationstar common stock in the Offering and who were damaged thereby (collectively, the "Securities Act Class").  Excluded from the Securities Act Class are:  (i) Defendants; (ii) present or former executive officers of Nationstar, members of Nationstar's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of Nationstar.

57.     The members of the Securities Act Class are so numerous and geographically dispersed that joinder of all members is impracticable.   As noted above, Nationstar sold

approximately 17,500,000 shares of common stock to investors in the Offering. While the exact number of Securities Act Class members can only be determined by appropriate discovery, Plaintiffs believe that Securities Act Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

58.     Plaintiffs' claims are typical of the claims of the members of the Securities Act Class because Plaintiff Ghatan's and all of the Securities Act Class members' claims arise from, and their losses were caused by, the same false and misleading representations and omissions made by, or chargeable to the Securities Act Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the interests of the Securities Act Class.

59.     Plaintiffs will fairly and adequately protect the interests of the Securities Act Class members and have retained counsel experienced and competent in class actions and securities litigation. Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Securities Act Class.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Securities Act Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Securities Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

61.     Questions of law and fact common to the members of the Securities Act Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Securities Act Class. Among the questions of law and fact common to the Securities Act Class are:

- 20 -

(a)      whether the Securities Act Defendants violated the federal securities laws as alleged herein;

(b)      whether the Offering Materials omitted and/or misrepresented material facts; and

(c)      whether the members of the Securities Act Class have sustained damages as a result of the decline in value of the Company's stock price, and, if so, what is the appropriate measure of damages.

**D.      Causes Of Action Under The Securities Act**

<u>COUNT I</u>

<u>For Violations of Section 11 of the Securities Act</u>
<u>(Against the Securities Act Defendants)</u>

62.      Plaintiffs incorporate by reference and reallege ¶¶2-5, 8-61 as if fully set forth herein.

For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be

construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based

solely on negligence.

63.      This claim is brought by the Securities Act Class against the Securities Act

Defendants pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k.

64.      At the time of the Offering, the Offering Materials contained untrue statements of

material fact, omitted to state facts necessary to make the statements made therein not misleading,

and failed to disclose required material information.

65.      Nationstar is the issuer of the common stock sold pursuant to the Offering Materials.

As the issuer of the stock, Nationstar is strictly liable to the members of the Securities Act Class who

purchased common stock in or traceable to the Offering for the materially untrue statements and

omissions that appeared in or were omitted from the Offering Materials.

66.      Bray, Stiles, Gidel, Hawkins and Malone signed the untrue and misleading

Registration Statement. These Defendants acted negligently and are therefore liable to the members

- 21 -

of the Securities Act Class who purchased shares of Nationstar common stock pursuant or traceable to the Offering Materials.

67.     The Underwriter Defendants were underwriters of the Offering.  The Underwriter Defendants acted negligently and are therefore liable to the members of the Securities Act Class who purchased shares of Nationstar common stock pursuant or traceable to the Offering Materials.

68.     Each of these Defendants is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Offering Materials.  These Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Offering Materials were true and not misleading, and that there were no omissions of any material fact.  Accordingly, these Defendants acted negligently, and are liable to the members of the Securities Act Class who purchased or otherwise acquired the common stock in or traceable to the Offering.

69.     Plaintiff Ghatan and other members of the Securities Act Class who purchased Nationstar common stock issued pursuant to the Offering Materials, and did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained therein.

70.     Plaintiff Ghatan and the other members of the Securities Act Class who purchased the common stock pursuant to the Offering Materials suffered substantial damages as a result of the untrue statements and omissions of material facts in the Offering Materials, as they either:  (i) sold these shares at prices below the Offering price of $28.49 per share; or (ii) still held shares as of the date of this Complaint, when the closing price of the common stock was $14.29 per share, which was below the Offering price of $28.49 per share. This Complaint is the first complaint to allege that

the Securities Act Defendants named in this Count violated § 11 of the Securities Act in connection with the Offering.

71. This claim is brought within the applicable statute of limitations.

72. By reason of the foregoing, the Securities Act Defendants named in this Count have violated § 11 of the Securities Act.

## COUNT II

### For Violations of Section 12(a)(2) of the Securities Act
### (Against the Underwriter Defendants)

73. Plaintiffs incorporate by reference and reallege ¶¶2-5, 8-72 as if fully set forth herein. For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

74. This claim is brought by the Securities Act Class against the Underwriter Defendants pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2).

75. The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the 17,500,000 shares of Nationstar common stock offered and sold in the Offering pursuant to the Offering Materials, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.   Among other things, the Underwriter Defendants transferred title of Nationstar stock to Plaintiff Ghatan and other members of the Securities Act Class who purchased shares in the Offering, and transferred title of Nationstar stock to other underwriters and/or broker-dealers that sold those securities as agents for the Underwriter Defendants. The Underwriter Defendants also solicited the purchase of Nationstar stock in the Offering by Plaintiff Ghatan and other members of the Securities Act Class who purchased in the Offering by means of the Offering

- 23 -

Materials, motivated at least in part by the desire to serve the Underwriter Defendants' own financial interest and the interests of Nationstar, including but not limited to earning commissions on the sale of Nationstar stock in the Offering.

76.     Plaintiff Ghatan and the other members of the Securities Act Class who purchased shares of Nationstar common stock in the Offering pursuant to the Offering Materials, and did not know, or in the exercise of reasonable care could not have known, of the untrue statements and omissions of material fact contained therein.

77.     Members of the Securities Act Class who purchased the shares of Nationstar common stock in the Offering pursuant to the Offering Materials are entitled to rescissory damages on any shares so purchased, but no longer held.  Members of the Securities Act Class who purchased the shares of Nationstar common stock in the Offering pursuant to the Offering Materials, and who still hold any such shares, have sustained damages as a result of the untrue statements and omissions of material fact in the Offering Materials, for which they hereby elect to rescind and tender all such shares of Nationstar common stock to the Defendants sued in this Count in return for the consideration paid for such shares, together with interest thereon pursuant to § 12(a)(2) of the Securities Act.

78.     This claim is brought within the applicable statute of limitations.

79.     By virtue of the foregoing, the Securities Act Defendants named in this Count violated §12(a)(2) of the Securities Act.

### COUNT III

### For Violations of Section 15 of the Securities Act
### (Against Bray, Stiles, Gidel, Hawkins, and Malone)

80.     Plaintiffs incorporate by reference and reallege ¶¶2-5, 8-79 as if fully set forth herein. For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be

construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

81.     This Count is asserted by the Securities Act Class against Defendants Bray, Stiles, Gidel, Hawkins, and Malone for violations of § 15 of the Securities Act.

82.     Bray, Stiles, Gidel, Hawkins, and Malone, prior to and at the time of the Offering, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Nationstar's business affairs, including the Offering.

83.     As officers and/or directors of a company engaging in an Offering, Bray, Stiles, Gidel, Hawkins, and Malone had a duty to disseminate accurate and truthful information with respect to Nationstar's business, financial condition and results of operations.  These Defendants participated in the preparation and dissemination of the Offering Materials, and otherwise participated in the process necessary to conduct the Offering.  Because of their positions of control and authority as senior officers and/or directors of Nationstar, these Defendants were able to, and did, control the contents of the Offering Materials, which contained materially untrue information and failed to disclose material facts.

84.     By reason of the aforementioned conduct, Bray, Stiles, Gidel, Hawkins, and Malone are liable under §15 of the Securities Act jointly and severally with, and to the same extent as, Nationstar is liable under § 11 and 12(a)(2) of the Securities Act, to Plaintiff Ghatan and members of the Securities Act Class who purchased or otherwise acquired common stock issued pursuant to the Offering Materials.

## VII.   EXCHANGE ACT VIOLATIONS

85.     The claims in Counts IV and V below are brought under §§ 10(b) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against the Exchange Act

Defendants for making materially false and misleading statements during the Class Period with actual knowledge or reckless disregard for the truth of their statements.

A.   **As Interest Rates Declined, The Exchange Act Defendants Touted Nationstar's Originations Segment And Its Key Metrics**

86.    Throughout the Class Period, the value of Nationstar's MSR portfolio was critical to its profitability.  Prior to and throughout the Class Period, Nationstar was facing a sustained period of declining interest rates that directly impacted its MSRs.  Specifically, in such an environment, prepayment speeds generally surge as homeowners with existing mortgage loans take advantage of the declining (and favorable) rates by refinancing their mortgages.  When a mortgage loan is refinanced, the income stream generated by its associated MSR ceases, and as a result, servicing revenues decline.  In addition, because Nationstar accounts for its MSR portfolio at fair value, and prepayment speed is a key determinant of the fair value of an MSR, the increased prepayment speeds resulting from declining interest rates also lead to mark-to-market devaluations of Nationstar's MSR portfolio.  Thus, declining interest rates negatively impact Nationstar's servicing business in two ways:  (i) lost income streams due to refinancing and prepayment; and (ii) mark-to-market losses on its remaining MSRs.  Because Nationstar was rapidly growing its MSR portfolio prior to and during the Class Period, the negative impact of declining interest rates on the Company is profitability was a critical concern for investors.

87.    Exacerbating this concern was the increased regulatory scrutiny that Nationstar was being subjected to throughout the Class Period.  For example, just prior to the Class Period, on March 5, 2014, Nationstar received a letter from the New York Department of Financial Services (the "NY DFS"), expressing concern over the rapid growth of its MSR portfolio.  Specifically, the NY DFS stated that "the Department has significant concerns that the explosive growth at Nationstar and other non-bank mortgage servicers may create capacity issues that put homeowners at risk."  As

a result, the NY DFS requested that Nationstar provide it with certain information relating to its mortgage servicing practices to ensure that the Company was operating in compliance with applicable regulations.  This heightened regulatory scrutiny over the Company's MSR growth presented a risk to Nationstar's ability to acquire additional MSRs, as the NY DFS had recently taken steps to block the acquisition of MSRs by one of Nationstar's competitors, Ocwen, based upon similar concerns over its capacity to properly service an increased volume of MSRs.

88.     In order to allay investor fears regarding the continued profitability of its Servicing segment, the Exchange Act Defendants began refocusing investors' attention to Nationstar's Originations segment.  Specifically, the Exchange Act Defendants repeatedly touted the Originations segment's supposed growth and profitability and represented to investors that, unlike the Servicing segment, the Originations segment **benefitted** from a declining interest rate environment.  This is because the same increased level of refinancing that negatively impacted Servicing revenue led to increased origination opportunities for the Originations segment. Through these opportunities, Nationstar proclaimed that its Originations segment was poised to not only increase profitability— which could then offset any declines in Servicing revenue—but also to continually replenish the Company's MSR portfolio by retaining the MSRs from the mortgages it originated.  For example, within the Company's earnings presentation for 4Q14/FY14, Nationstar proclaimed that 2014 would be the Originations segment's "[r]eturn to profitability," representing that the unit provided for a "cost-effective and profitable creation of long-term servicing assets."

89.     However, Defendants' focus on the Originations segment was misleading.  According to Loan Officer-1,[2] originating new business was not the primary focus of the Company's business

---

[2] This former employee worked as a loan officer at Nationstar's GreenLight lending operations in Irvine, California from August 2014 until September 2015.  Loan Officer-1 was responsible for selling loans to potential borrowers across various states and gained firsthand knowledge of the Company's loan origination practices, and, in particular, its practices with respect to Nationstar's Originations pipeline.

model.  Rather, its primary business plan was to recapture loans from its MSR acquisitions.  Indeed, a constant directive at Nationstar was to get all the "on-boarding" consumers into new loans. However, because Nationstar offered these borrowers interest rates that were generally higher than its competitors, it was unable to successfully fund many of the loans that entered its "locked pipeline," thus confirming that, contrary to the Exchange Act Defendants' representations, the "locked pipeline" was not a reliable indicator of future growth within the Originations segment.

90.    Despite this, as part of this focus on it Originations segment, Nationstar also began directing investors to what it described as "key metrics," which it proclaimed were "critical to understanding the Originationd segment's ability to . . . become a viable source of revenue" comparable to the Servicing segment to which Nationstar had previously directed investors' focus. Two of these key metrics were the "application pipeline" and "locked pipeline."  Nationstar used these terms as follows:

(a)    "**Applications Pipeline" or "Applications Volume**":  Nationstar selectively reported this pro forma metric selectively in its 1Q14 and 2Q14 earnings releases and its 2Q14 and 3Q14 Form 10-Qs.  The terms were used interchangeably, and purportedly represent the total dollar amount of residential mortgage loan applications that the Company received but had not yet been locked or funded; and

(b)    "**Locked Pipeline**":  Nationstar selectively reported this pro forma metric in its 1Q14, 2Q14, 3Q14, and 4Q/FY14 earnings releases, and its 2Q14 and 3Q14 Form 10-Qs.  This metric purportedly represents the dollar amount of residential mortgage loan applications in process that have been "locked in" at set interest rates but have not yet been funded.  In addition, as set forth below, the Company made regular pronouncements regarding the growth and strength of its Originations business.

91.    When a potential borrower submits a loan application to Nationstar along with certain minimal personal information, the loan is recorded within the application pipeline/volume metric. The loan application is then either approved or denied.  If Nationstar approves the loan application, the borrower signs certain disclosures and locks in an interest rate.  During this time, the loan is recorded within Nationstar's "locked pipeline."  Once the loan is approved, it is funded by

Nationstar and transitions from "locked pipeline" to "funded volume."  Once funded, Nationstar is able to derive profits from both the sale of the loan and the retained MSR.  Throughout the Class Period, the Company touted these metrics as indicative of the profitability of the Originations segment as a whole.  In this regard, Nationstar pointed to these metrics as being reflective of the Originations segment's "Return to Profitability." Accordingly, Nationstar portrayed applications pipeline/volume and locked pipeline as strong indicators of future funded volume, and thus strong indicators of the Originations segment's future profitability.

92.     Not surprisingly, these metrics became regular topics of discussion and focus in the Company's financial result filings with the SEC, press releases, conference calls and earnings presentations throughout the Class Period.  In fact, during the 3Q14 earnings conference call, Nationstar announced that it would "no longer be updating GAAP guidance," but instead would "provide trends to consider that could have a substantial impact on the operations of the business." In lieu of such guidance, Stiles specifically directed investors to the Originations segment's "key metrics," which included the locked pipeline and the applications pipeline, set forth in the Company's earnings presentation as a means of evaluating Nationstar's financial condition and growth.

93.     By directing investors to the "key metrics" that purportedly measured the growth and profitability potential of the Originations segment, the Exchange Act Defendants misled investors into believing that, among other things, the Originations segment was poised to make up for any negative impact on the Company's core Servicing segment due to declining interest rates.  For example, as interest rates declined, Bray routinely touted and urged investors to focus on Origination's "***very strong application and locks***" (2Q14 earnings conference call) and linked the Company's purportedly robust (and expanding) pipeline to growth and profitability goals.

- 29 -

**B.    These Key Metrics Were Materially Misleading And Not Indicative Of The Company's Ability To Generate Revenues From The Originations Segment**

94.     While the Exchange Act Defendants routinely touted Nationstar's application volume and locked pipeline figures as proxies for the future success of the Originations segment, in truth, these key metrics overstated Nationstar's growth potential because they included an increasing number of loans that the Exchange Act Defendants knew were unlikely to ever be funded by the Company.

95.     According to Loan Officer-1 and Loan Officer-2[3], Nationstar was aggressively seeking to increase application volume and the locked pipeline and, as a result, a substantial number of applications were approved and locked into the pipeline that were:  (i) riddled with critical conditions precedent to funding, or (ii) highly susceptible to cancellation due to Nationstar's inability to offer competitive interest rates.  As a result, rather than progress from application volume to locked pipeline to funding (and then revenues), many of these loans had a very low likelihood of ever generating profits for the Company.  In fact, the additional expenses associated with processing these low-probability originations further eroded the Company's profitability.

96.     Worse still, after the expiration of the 90 to 120 day period (or, sometimes, longer), certain loans would be denied, immediately reprocessed, and routed back into the next quarter's locked pipeline, further contributing the misleading nature of the locked pipeline figure. Specifically, as Loan Officer-2 explained, a consumer with a locked loan was given 45 days to satisfy the conditions precedent on their loan, plus an automatic extension of 28 days, as long as they

---

[3] This former employee worked as a loan officer at Nationstar's GreenLight lending operations in Irvine, California from August 2014 until July 2015 and had a reporting line to a Loans Sales Manager at Greenlight.  Loan Officer-2 was one of the top 15 producers of approximately 250 Nationstar loan officers and was responsible for selling loans to potential borrowers across various states.  In this capacity, Loan Officer-2 gained firsthand knowledge of the Company's loan origination practices, and, in particular, its practices with respect to Nationstar's loan origination pipeline.  Although this former employee began employment in August 2014, Loan Officer-2 was made aware of the Company's origination practices from April 2014 through Loan Officer-2's discussions with other Nationstar employees, including Loan Officer-2's supervisors.

hit certain milestones.  When that extension passed, Loan Officer-2 was instructed to "sell the loan," which meant that he called the consumer and sold them a higher rate loan and/or increased fees, just to keep them in the pipeline.  In such a way, these loans sat in the pipeline for 90 to 120 days before eventually being denied by Nationstar.  Once denied, however, the process restarted and Nationstar began marketing to these consumers again within a month or two of being denied with the goal of locking them in again.

97.     By selectively disclosing these misleading figures to support the Originations segment's purported growth story, the Exchange Act Defendants misled investors into believing that the pool of "locked" loans likely to be funded by the Company was significantly larger than it was in reality.  Thus, while the Company represented to investors that its locked pipeline (and application volume that led to those locks) was a key indicator of future growth potential for the Originations segment and its viability as a revenue source to offset any declines in the Servicing segment, these representations were, to a material extent, illusory.

### C.     The Exchange Act Defendants' Statements Were Materially False And Misleading Statements And/Or Omitted Material Facts

98.     For the foregoing reasons, each of the locked pipeline and application pipeline/volume figures disclosed in the following Nationstar public disclosures throughout the Class Period was materially false and misleading and/or omitted material facts:

| Quarter | Application Volume | Locked Pipeline | Source |
|---------|--------------------|-----------------|--------|
| 1Q14 | $3.5 billion | $2.7 billion | 1Q14 Form 8-K |
| 2Q14 | $5.0 billion | $2.6 billion | 2Q14 Form 8-K; Q2 Earnings Presentation |
| 3Q14 | $3.5 billion | $2.4 billion | 3Q14 Form 10-Q; Q3 Earnings Presentation |
| 4Q14 | N/A | $2.8 billion | 2014 Form 10-K |

99.     In addition to the materially misleading figures published by the Exchange Act Defendants throughout the Class Period, these Defendants also made numerous statements concerning those figures on earnings conference calls and, misleadingly issued and/or reaffirmed financial guidance based in part on the purported strength of these metrics.  Each of the following statements was materially false and misleading and/or omitted material facts.

100.    For example, on May 8, 2014, Nationstar announced its financial results for 1Q14. Within an accompanying earnings presentation, the Exchange Act Defendants touted the Originations segment's "Return to Profitability" and growth within 1Q14 and reaffirmed that the Company's "overarching strategy for our [O]rigination segment remains unchanged, to generate attractive long term servicing assets at a profit that will sustain and grow our servicing portfolio." As purported evidence of that strategy's success, Nationstar pointed to the robust application volume and locked pipeline for the quarter of $3.5 billion and $2.7 billion, respectively. Based on these results, the Company reaffirmed its GAAP guidance of $4.00-$5.00 per share for 2014.

101.    Similarly, on August 6, 2014, in an earnings release announcing its financial results for 2Q14, while Nationstar initially stated that the Servicing segment was flat quarter-over-quarter, the Company quickly reaffirmed the strength of the Company's operations by highlighting the purported growth within the Originations segment.  To this end, the Company announced an application volume and locked pipeline of $5.0 billion and $2.6 billion, respectively, presenting a quarter-over-quarter comparison of the former that showed a 43% increase from 1Q14.  On an earnings conference call held that same day, Bray expressed optimism concerning the Originations segment and its ability to replenish the Company's MSR portfolio:  "[F]rankly, rightsizing the origination operation, we're moving the Greenlight Nationstar to one common platform. And so the focus has been, you know, let's optimize our capacity…. ***And I think in the coming quarters, there***

- 32 -

*clearly will be an increase in recapture and continuing -- and we are still seeing very strong application and locks.  And so, I'm pretty bullish about it*."  Stiles also spoke positively about Originations, stating that "[t]he mark right now remains strong for originations."  Accordingly, despite the apparent downturn in Servicing, Nationstar again reaffirmed its GAAP guidance of $4.00-$5.00 per share for 2014.

102.    Shortly thereafter, Oppenheimer published a report addressing the Company's Originations segment and, among other things, lauding the Company's purported ability to generate Originations revenue from its MSR portfolio.  Oppenheimer also cited the apparent revenue streams created through the purportedly strong application and lock-in process:  "We don't have official percentages, but we suspect that there is probably a good conversion rate from pre-approval/qualification provider to actual originations."  Oppenheimer concluded that "*Bottom line:* There is both a great amount of financial and strategic sense in reaching out to your servicing book customers and offering them a pre-approval or pre-qualifying letter as soon as they list their homes for sale."  (Emphasis in original).

103.    On November 6, 2014, Nationstar published its financial results for 3Q14.  On the earnings conference call that day, Stiles directed investors to the Company's accompanying earnings presentation, which also highlighted the Originations segment's locked pipeline of $2.4 billion.  Similarly, as discussed above, the Company disclosed a $3.5 billion application pipeline.  On the call, after earlier representing that the Company had "transformed [O]riginations into a significantly large and highly profitable business," Stiles highlighted the positive impact declining interest rates was having on Originations, stating "we've seen October as rates have come down, *we've seen locks pick up, and we had a nice October in that business* [i.e. Originations]."

104.    Finally, on February 26, 2015 and February 27, 2015, Nationstar announced its 4Q/FY 14 financial results and published various filings reporting the same.  Therein, the Exchange Act Defendants continued to make materially misleading statements about Nationstar's positive growth potential and expectations for 2015 and emphasized to investors' it's the metrics it claimed were fueling its Originations segment and, in particular, its purported $2.8 billion locked pipeline for the quarter.  On the earning conference call, Bray urged investors to "***look at the level of locks and level of submissions we are experiencing in January 2015***." Bray went on to proclaim that "***we've had in the first quarter the highest lock days we've had in the history of company and we want to make sure the capacity is focused on that***."  The Exchange Act Defendants' characterization of these metrics—i.e., emphasizing the Company's fulsome locked pipeline as a predictor of profitability—mitigated the sharp decline in the stock price and reassured investors that Nationstar was executing on its business plan.

105.    As discussed above in ¶¶94-97, each of the foregoing statements was materially false and misleading and/or omitted material facts because, contrary to their representations of Origination's "return to profitability" and contribution to the Company's financial health, the positive impact of the declining interest rates on the Company's Originations segment could not make up for their negative impact on the Servicing segment.  Nevertheless, the Exchange Act Defendants issued and reaffirmed optimistic guidance throughout the Class Period, based at least in part upon the Company's illusory locked pipeline (along with the application pipeline).  In truth, however, the  record "locks" the Company touted were nothing more than a façade, lacking any material value given that a significant number of loans included in the disclosed locked pipeline (some of which had been double or tripled counted across quarters) would never translate into profits.

### D.   The Truth Concerning The Exchange Act Defendants' Conduct Is Revealed

106.   The true facts concerning the Exchange Act Defendants' untrue and misleading statements did not begin to emerge until February 26, 2015 when, as discussed above, Nationstar announced its 4Q/FY 14 financial results.  In sharp contrast to the Company's overly optimistic representations and guidance to date, Nationstar reported EPS of just $0.58, rather than the expected EPS of $0.91.  The Company blamed higher servicing expense, increased amortization and a reported $46 million write-down on the value of its MSRs.  In other words, Nationstar disclosed that for 4Q14, the purported strength and growth of the Company's Originations segment and locked pipeline had failed to make up for the impact of the declining interest rate on Servicing.  On this news, the price of Nationstar stock declined 13.55%, from a closing price of $31.29 per share on February 25, 2014 to a closing price of $27.05 per share on February 26, 2015.  Nevertheless, the Exchange Act Defendants continued to mislead investors by issuing additional materially misleading positive statements about Nationstar's growth potential and expectations for 2015.  *See* ¶104.

107.   On May 5, 2015, however, before the open of trading, the full truth concerning the Exchange Act Defendants' untrue and misleading statements emerged.  On that day, Nationstar issued a press release announcing its financial results for the first quarter ended March 31, 2015 ("1Q15 Press Release").  In the 1Q15 Press Release, Nationstar announced a *net loss* of $0.53 per share rather than the anticipated $0.71 per share *net profit* the Exchange Act Defendants had led the market to expect.  The Company also disclosed that its revenue had tumbled 15% year-over-year to $382 million, reflecting a 45% sequential plunge in quarterly revenue in its Servicing segment to $109 million.  Even more problematic for Nationstar's Servicing segment was the fact that the declining interest rates had caused the Company to take a $110 million ($0.77 per share) write-down on the value of the Company's MSRs and realize $17 million quarterly increase in amortization,

both of which Nationstar represented were caused by the deteriorating interest rate environment, which had, among other things, led to higher prepayments of existing loans.  For Originations, the while funded volume for the quarter rose, analysts noted that those volumes were offset by increased expenses of $100 million, $17 million above Wall Street expectations.  Moreover, unlike prior quarters, Nationstar abandoned the reporting of its locked pipeline to the market during the first quarter, despite previously identifying it as a "key metric."

108.    In the wake of Nationstar's dismal performance, the Exchange Act Defendants were forced to admit that merely locking in loans was not translating into profitability sufficient to balance out the negative impact of the interest rate environment on Servicing. To that end, despite their efforts to continually focus investors on Originations, Bray finally admitted that Originations gains could not offset Servicing losses, and that the overall profitability and success of the Company was dependent upon Servicing:  "I think it's the servicing business that we've got to continue to focus on and continue to see if we can -- A, with the volatility with rates, certainly has had an impact; and B, we got to continue to get some of those revenue pieces that I talked about and continue to drive costs down. ***But that's the one where we have got to continue to focus on the core operations and frankly the volatility with the rates***."

109.    On this news, the price of Nationstar stock plummeted.  After closing at $26.17 per share on May 4, 2015, the stock dropped 25% ($6.66) to close at $19.51 per share on May 5, 2015, on unusually high trading volume of more than ten million shares, thirteen times the average daily volume of the prior ten trading days.

110.    In wake of this news, several market analysts following Nationstar immediately issued reports on the earnings miss announced on May 5, 2015, cutting estimates and stock price targets while citing the Company's below-consensus financial results and the Company's servicing

fee weakness.  For example, on May 5, 2015, Oppenheimer & Co. Inc. issued a report lowering the target price of Nationstar stock from $32 to $24, noting the "first quarter was dreadful," that the Company's "presentation of servicing profitability was changed again" and that Nationstar has "no reiteration of guidance" for the year.  In short, Oppenheimer wrote that that none of these factors "inspire confidence."

111.    On May 6, 2015, Barclays Capital Inc. lowered it price target 30%, from $30 to $21, due to the "big earnings miss on weak servicing profit margins," and noted that the Company would need to increase servicing margins or lower acquisitions costs to "near fire-sale levels" in order to meet a "mid-teens" return on equity.

### E.    The Exchange Act Defendants' Scienter

112.    As alleged herein, numerous facts give rise to a strong inference that, throughout the Class Period, Nationstar, Bray, Hisey and Stiles knew or recklessly disregarded that the statements identified above were materially false and misleading when made.

113.    Bray, Hisey and Stiles acted with scienter in that each:  (i) knew or recklessly disregarded that the public statements or documents issued or disseminated in the name of the Company (or in their own name) were materially false and misleading when made; (ii) knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. Nationstar, Bray, Hisey and Stiles, by virtue of their receipt of information reflecting the true facts regarding Nationstar, and their control over, receipt and/or modification of the alleged materially misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

114.    Bray, Hisey and Stiles, because of their respective positions at Nationstar, controlled the contents of the Company's public statements during the Class Period.  Each was provided with,

or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  For example, according to Finance Manager,[4] on weekly basis Bray held a conference call with majority shareholder Fortress in which he would discuss the Company's key financial metrics, including, among other things, changes in the prepayment rate and amortization, the interest rate, and the recapture rate.  Prior to that meeting, Bray was provided detailed, contemporaneous information on each of these topics.  Likewise, according to Loan Officer-2, Nationstar maintained a Company-wide data concerning, among other things, the Originations pipeline on Nationstar's Encompass system, which made clear that a large number of loans the Company has represented were "locked" had conditions precedent that made it very unlikely that such loans would ever be funded (and, in turn, translate into revenues).

115.    Because of their respective positions and access to material non-public information concerning the Company, each knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the positive representations that were being made were materially false, misleading, and incomplete.  As a result, Bray, Hisey and Stiles are responsible for the accuracy of Nationstar's corporate statements, and are therefore responsible and liable for the representations contained therein or omitted therefrom

116.    Throughout the Class Period, Nationstar, Bray, Hisey and Stiles consistently elected to speak about the interest rate environment and the criticality of the Company's ability to maintain its Originations volume in order to maintain profitability and replenish its core MSR portfolio.  The

---

[4] This former employee worked as a Finance Manager for Nationstar from June 2014 until February 2015 and an Assistant Vice President, Portfolio Metrics and Rating Agency, from February 2015 until June 2015.  In this role, Finance Manager prepared Service Organization Controls Reports ("SOC 1 Reports") regarding the Company's internal control over financial reporting on a monthly basis, and, in particular, assisted with the preparation of SOC 1 servicing reports specifically for Fortress to show, among other things, that Nationstar was correctly reporting MSR values and that the Company's internal control systems were in order.  Finance Manager reported to Nationstar's Vice President of Finance.

misrepresentations and omissions of material fact described herein concerning these topics could not have been made during the Class Period without the knowledge and complicity or reckless disregard of the personnel at the highest levels of the Company, including Bray, Hisey and Stiles.  Given the importance of these topics, there is a strong inference that the Exchange Act Defendants knew of information concerning the subject matter of their statements, or, at minimum, were reckless in speaking while ignorant of the facts.

>       **F.       Loss Causation For The Exchange Act Claims**

117.    For purposes only of the Exchange Act claims alleged herein, the Exchange Act Defendants' unlawful conduct alleged herein directly and proximately caused the losses suffered by Plaintiffs and other Class members.  The materially false and misleading statements and omissions of material fact set forth herein were widely disseminated to the securities market, investment analysts, and the investing public.  These materially false and misleading statements and omissions regarding, among other things, the impact of the deteriorating interest rate environment on Nationstar's financial condition and the Company's inability to maintain volume within its Originations segment, caused the Company's common stock to trade at artificially-inflated prices throughout the Class Period.  As the true facts became known, the price of Nationstar common stock declined, causing damage to Plaintiffs and the Class

118.    Specifically, as discussed above at ¶¶104 and 106, before the market opened on February 26, 2015, Nationstar announced the Company's 4Q14/FY14 financial results, shocking the market by disclosing, among other things—and in sharp contrast to the Company's overly optimistic representations and guidance to date—an EPS of just $0.58 rather than the expected EPS of $0.91. The Company blamed the approximately $90 million miss on higher servicing expense, increased amortization and a reported $46 million write-down on the value of its MSRs.

119.    In response to the Company's disclosing the failure of its Originations segment to meet its earnings guidance because of the declines in the Servicing segment, the share price of Nationstar's common stock dropped by approximately 14% from a close of $31.29 per share on February 25, 2015 to $27.05 per share on February 26, 2015 on large volume.

120.    On May 5, 2015, prior to the start of trading, Nationstar issued the 1Q15 Press Release and announced a startling net loss of $0.53 per share rather than the $0.71 per share gain that Nationstar had led the market to expect.  In addition to the loss, the Company disclosed that its revenue tumbled 15% year-over-year to $382 million, including a 45% sequential plunge in quarterly revenue in its Servicing segment to $109 million.  The Company blamed the majority of the disappointing results on the Servicing segment, disclosing a $110 million write-down on the value of the Company's MSRs and $17 million quarterly increase in amortization, both of which Nationstar represented were caused by the deteriorating interest rate environment, which had, among other things, led to higher prepayments of existing loans. The Company also reported a significant increase in expenses related to the Originations segment to $100 million, $12 million above analysts' expectations.  *See* ¶¶107-11.

121.    As numerous analysts reported that same day and in the days that followed, Nationstar's results fell well short of Wall Street expectations and of the Company's own guidance, as set forth above at ¶¶109-11.

122.    In response to the Company's disclosing that its Origination's segment could not sustain the profitability of Nationstar in the face of the deterioration of its Servicing segment, contrary to the Company's prior representations, the share price of Nationstar's common stock fell from a close of $26.17 per share on May 4, 2015 to $19.51 per share on May 5, 2015, an astounding

25% fall ($6.66) on unusually high trading of ten million shares, ***thirteen times the average daily volume*** of the prior ten trading days.

123.    Accordingly, the conduct of the Exchange Act Defendants as alleged herein proximately caused foreseeable losses for Plaintiffs and the other members of the Class who purchased or otherwise acquired Nationstar common stock during the Class Period.

124.    The timing and magnitude of the price decline in Nationstar's common stock negates any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members was a direct result of the Exchange Act Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's common stock and the subsequent significant decline in the value of Company's common stock when the truth was revealed.

125.    As a result of these disclosures, and the corresponding drops in the price of Nationstar's common stock, Plaintiffs and other Class members have suffered economic loss.

### G.    The Presumption Of Reliance Applies

126.    At all relevant times, the market for Nationstar's common stock was open and efficient for the following reasons, among others:

(a)    The Company's stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a registered and regulated issuer, Nationstar regularly made public filings and press releases with the SEC;

(c)    Nationstar regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services; and

(d)    Nationstar was followed by several securities analysts employed by major brokerage firms, such as Sterne Agee, Morgan Stanley and Barclays, among others, who authored research reports that were distributed to the brokerage firms' sales force and the public at large.  Each of these reports was publicly available and entered the public marketplace.

127.    As a result of the foregoing, the market for Nationstar's common stock promptly digested current information regarding the Company from all publicly available sources, and the prices of Nationstar common stock reflected such information.  Based upon the materially false and misleading statements and omissions of material fact alleged herein, Nationstar common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and all other members of the Class purchased Nationstar common stock relying upon the integrity of the market price of Nationstar common stock and other market information relating to Nationstar.

128.    Under these circumstances, all Class members suffered similar injuries through their purchases and/or acquisitions of Nationstar common stock at artificially inflated prices, and the presumption of reliance under the fraud-on-the-market doctrine applies.

129.    In sum, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    The Exchange Act Defendants made public misrepresentations during the Class Period;

(b)    The misrepresentations were material;

(c)    The Company's securities traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's securities between the time the Exchange Act Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

- 42 -

130.     Further, at all relevant times, Plaintiffs and the other members of the Class reasonably relied upon the Exchange Act Defendants to disclose material information as required by law and in the Company's SEC filings.  Plaintiffs and the other members of the Class would not have purchased or otherwise acquired Nationstar common stock at artificially inflated prices if the Exchange Act Defendants had disclosed all material information as required.  Thus, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts concerning the Company and its operations, Plaintiffs and the other members of the Class have satisfied reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972) ("*Affiliated Ute*").

## H.     The Statutory Safe Harbor And Bespeaks Caution Doctrine Are Inapplicable

131.     The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements alleged herein.

132.     None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

133.     To the extent that any materially false and/or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.  As set forth above in detail, given the then-existing facts contradicting the Exchange Act Defendants' statements, the generalized risk disclosures made by the Exchange Act Defendants were not sufficient to insulate the Exchange Act Defendants from liability for their materially false and misleading statements.

134.     To the extent that the statutory safe harbor may apply to any materially false and/or misleading statement alleged herein, or a portion thereof, the Exchange Act Defendants are liable for any such false and/or misleading forward-looking statement because at the time such statement was made, the speaker actually knew the statement was false, or the statement was authorized and/or approved by an executive officer of Nationstar who actually knew that the statement was false.

135.     Moreover, to the extent that the Exchange Act Defendants issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because Nationstar, Bray, Hisey and Stiles had actual knowledge of existing, but undisclosed, material adverse facts that rendered such "cautionary" disclosures materially false and/or misleading.

## I.     Class Allegations Applicable To The Exchange Act Claims

136.     Plaintiffs bring their Exchange Act Claims as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) individually and on behalf of the Class, consisting of all persons and entities that purchased or otherwise acquired Nationstar common stock during the Class Period and who were damaged thereby.  Excluded from the Class are:  (i) Defendants; (ii) present or former executive officers of Nationstar, members of Nationstar's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of Nationstar.

137.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  According to the Company's SEC filings, just two days after the close of the Class Period, Nationstar had more than 109 million shares outstanding.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that

Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

138.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all of the Class members' claims arise from, and their losses were caused by, the same false and misleading representations and omissions made by, or chargeable to, the Exchange Act Defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the interests of the Class.

139.    Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel experienced and competent in class actions and securities litigation.  Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Class they seek to represent.

140.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

141.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

      (a)    whether Defendants violated the federal securities laws as alleged herein;

      (b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

- 45 -

(c)  whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)  whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)  whether the Exchange Act Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts;

(f)  whether the market prices of the Company's securities during the Class Period were artificially inflated due to the Exchange Act Defendants' material nondisclosures and/or misrepresentations complained of herein; and

(g)  whether the members of the Class have sustained damages as a result of the decline in value of the Company's stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

**J.  Causes Of Action Under The Exchange Act**

<u>COUNT IV</u>

<u>For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
(Against Nationstar, Bray, Hisey and Stiles)</u>

142.  Plaintiffs incorporate by reference and reallege ¶¶1, 3-4, 6-19, 28-35, 85-141 as if fully set forth herein.  This claim under §10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, is asserted by Plaintiffs on behalf of themselves and all other Class members against Nationstar, Bray, Hisey and Stiles.

143.  During the Class Period, the Exchange Act Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange to knowingly and/or recklessly make and/or approve the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs and the other Class members; (ii) artificially inflate and/or maintain the market price of Nationstar's common stock; and (iii) cause Plaintiffs and the other members of the Class to purchase or otherwise acquire Nationstar common stock at artificially inflated prices.  In furtherance

- 46 -

of their unlawful scheme, plan, and course of conduct, the Exchange Act Defendants took the actions alleged herein.

144.    While in possession of material adverse non-public information, the Exchange Act Defendants individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Nationstar common stock, in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Exchange Act Defendants are sued as primary participants in the wrongful conduct alleged herein.

145.    By virtue of their high-level positions at the Company during the Class Period, Bray, Hisey and Stiles were authorized to make public statements, and made public statements during the Class Period on Nationstar's behalf.  These Defendants also were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they either knew, or recklessly disregarded, was materially false and misleading.

146.    In addition to the duties of full disclosure imposed on the Exchange Act Defendants as a result of making affirmative statements and reports to the investing public, the Exchange Act Defendants had a duty to disclose information required to update and/or correct their prior misstatements and/or omissions, and to update any statements or omissions that had become false or misleading as a result of intervening events.  Further, the Exchange Act Defendants had a duty to

promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. Section 210.01, *et seq.*) and Regulation S-K (17 C.F.R. Section 229.10, *et seq.*), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information.  Bray, Hisey and Stiles also had duties under SOX to ensure that Nationstar's Forms 10-Q and 10-K filed with the SEC did not misrepresent or omit any material facts.

147.   The Exchange Act Defendants acted with knowledge or a reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and to disclose such facts, even though such facts were known or readily available to them.  The Exchange Act Defendants' material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Nationstar's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

148.   The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Nationstar's common stock during the Class Period.  In ignorance of the fact that the market prices of Nationstar's common stock were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by the Exchange Act Defendants and on the efficiency and integrity of the market in which the Company's common stock trades, or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiffs and the other members of the Class purchased Nationstar's common stock during the Class

Period at artificially inflated prices.  As the previously misrepresented and/or concealed material facts eventually emerged, the price of Nationstar's common stock substantially declined.

149.    At the time of the material misrepresentations and omissions alleged herein, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class known the truth with respect to the business, operations, performance, and prospects of Nationstar, which was misrepresented and/or concealed by the Exchange Act Defendants, Plaintiffs and the other members of the Class would not have purchased Nationstar's common stock, or if they had purchased such stock, would not have done so at the artificially inflated prices that they paid.

150.    By virtue of the foregoing, the Exchange Act Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

151.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was removed from the Company's stock.

## COUNT V

### For Violations of Section 20(a)) of the Exchange Act
### (Against Bray, Hisey and Stiles)

152.    Plaintiffs incorporate by reference and reallege ¶¶1, 3-4, 6-19, 28-35, 85-151 as if fully set forth herein.  This claim is asserted against Bray, Hisey and Stiles pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), by Plaintiffs on behalf of itself and all other Class members.

153.    During the Class Period, Bray, Hisey and Stiles were senior executive officers and/or directors of the Company.  As such, each of these Defendants was privy to confidential and

proprietary information concerning Nationstar, and its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations

154.    By reason of the foregoing, Bray, Hisey and Stiles had regular access to non-public information about Nationstar's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

155.    Bray, Hisey and Stiles acted as controlling persons of Nationstar within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  These Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

156.    In particular, Bray, Hisey and Stiles had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

157.     As set forth above, Nationstar, Bray, Hisey and Stiles violated §10(b) and Rule 10b-5 by making or causing to be made the materially false and misleading statements and omissions of material fact alleged herein.  By virtue of Bray's, Hisey's and Stiles' status as controlling persons, and their respective participation in the underlying violations of § 10(b) and Rule 10b-5, these Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases and/or acquisitions of the Company's common stock during the Class Period.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

A.     Declaring that this action is a proper class action and certifying Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel for the proposed Class;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D.     Awarding rescission or a rescissionary measure of damages; and

E.     Such other and further relief as the Court deems appropriate.

## IX.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all triable claims and issues.

- 51 -

DATED:  October 16, 2015                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            JACK REISE
                                            Florida Bar No. 058149
                                            STEPHEN ASTLEY
                                            Florida Bar No. 139254
                                            ELIZABETH A. SHONSON
                                            Florida Bar No. 22282


                                                    *s/ Jack Reise*
                                            JACK REISE

                                            120 East Palmetto Park Road, Suite 500
                                            Boca Raton, FL 33432
                                            Telephone: (561) 750-3000
                                            Facsimile: (561) 750-3364
                                            jreise@rgrdlaw.com
                                            sastley@rgrdlaw.com
                                            eshonson@rgrdlaw.com

                                            KESSLER TOPAZ MELTZER
                                              & CHECK, LLP
                                            SHARAN NIRMUL (*pro hac* forthcoming)
                                            RICHARD A. RUSSO, JR. (*pro hac* forthcoming)
                                            MEREDITH L. LAMBERT (*pro hac* forthcoming)
                                            JOSHUA A. MATERESE (*pro hac* forthcoming)
                                            280 King of Prussia Road
                                            Radnor, PA 19087
                                            Telephone: (610) 667-7706
                                            Facsimile: (610) 667-7056
                                            snirmul@ktmc.com
                                            rrusso@ktmc.com
                                            mlambert@ktmc.com
                                            jmaterese@ktmc.com

                                            *Co-Lead Counsel for Lead Plaintiffs and the*
                                            *Additional Named Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 16, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

s/ JACK REISE
_____
