UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-61170-Civ-DIMITROULEAS

CITY OF ST. CLAIR SHORES POLICE AND
FIRE RETIREMENT SYSTEM, Individually
and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

NATIONSTAR MORTGAGE HOLDINGS
INC., et al.,

Defendants.

_____ /

ORDER GRANTING MOTION TO DISMISS AMENDED COMPLAINT

THIS CAUSE is before the Court upon the Motion of Defendants Nationstar Mortgage

Holdings Inc. ("Nationstar"), Jesse K. Bray ("Bray"), Robert D. Stiles ("Stiles"), David C. Hisey

("Hisey"), Robert H. Gidel ("Gidel"), Brett Hawkins ("Hawkins"), and Michael D. Malone

("Malone")[1] to Dismiss the Amended Complaint (the "Motion") [DE 55].  The Court has

carefully considered the Motion, Plaintiffs Oklahoma Firefighters Pension & Retirement System

("OFP"), City of Taunton Contributory Retirement System ("City of Taunton"), Southeastern

Pennsylvania Transportation Authority Consolidated Pension Plan ("SEPTA"), Pembroke Pines

Firefighters and Police Officers Pension Fund ("Pembroke") and Shawn Ghatan, as Trustee of

---

[1] Underwriter Defendants Defendant Barclays Capital Inc. ("Barclays"), Defendant Citigroup Global Markets Inc. ("Citigroup"), and Defendant J.P. Morgan Securities LLC ("J.P. Morgan") (collectively, "Underwriter Defendants") join in the Motion with respect to the claims asserted against them (those under Sections 11 and 12(a)(2) of the Securities Act). *See* [DE 55] at p. 30.

1

the SDG Trust ("Ghatan") (collectively, "Plaintiffs")'s Opposition [DE 60], Defendants' Reply

[DE 66], and is otherwise fully advised in the premises.

### I.        Background

This case is in essence two separate sets of claims rolled into one action.  First, Plaintiffs

bring this action on behalf of themselves and on behalf of a class (the "Class") consisting of all

persons who purchased or otherwise acquired Nationstar common stock from May 8, 2014

through May 4, 2015 (the "Class Period") against Defendants Nationstar, Bray, Hisey, and Stiles

(collectively, the "Exchange Act Defendants") for violations of §§ 10(b) and/or 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule

10b-5 promulgated thereunder by the United States Securities and Exchange Commission

("SEC"), 17 C.F.R. § 240.10b-5. *See* [DE 31] (Amended Complaint) at ¶ 1.

Plaintiffs separately assert claims under §§ 11, 12(a)(2), and/or 15 of the Securities Act of

1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o against Defendants Nationstar,

Bray, Stiles, Gidel, Hawkins, Malone, and the Underwriter Defendants (collectively, "the

Securities Act Defendants") on their own behalf and on behalf of all persons or entities who

purchased shares in a secondary public offering (the "Offering") of 17,500,000 shares of

Nationstar common stock (the "Securities Act Class") issued and sold pursuant to a registration

statement on Form S-3 (File No. 333-18872), as amended by Post Effective Amendment No. 1

filed with the SEC on February 27, 2015 (the "Registration Statement"), including an

accompanying preliminary prospectus filed therewith ("Preliminary Prospectus"), and a

preliminary prospectus supplement ("Preliminary Prospectus Supplement") and final prospectus

supplement ("Prospectus") filed pursuant to Rule 424(b) of the Securities Act with the SEC on March 25 and March 26, 2015.[2]  *See* [DE 31] at ¶ 2.

Plaintiffs plead their fraud-based Exchange Act allegations separately from their strict-liability and negligence-based Securities Act allegations, taking care to note that their Securities Act allegations do not sound in fraud. *See* [DE 31].   The will now lay out Plaintiffs' allegations, as set forth in the Amended Complaint. [DE 31].  Additional specific allegations shall be addressed in more detail as necessary as the Court discusses the parties' arguments.

Formed in 2011, Nationstar is one of the largest non-bank residential mortgage servicers in the United States. *See* [DE 31] at ¶¶ 4, 28.  Nationstar conducts its business through three operating segments:  Servicing, Originations and Solutionstar. ¶ 28.  Servicing is Nationstar's largest segment, accounting for 70% of its business. ¶ 29.

The profitability of Nationstar's Servicing and Originations segments are subject to material risks related to changes in prevailing interest rates. ¶ 32.  Interest rates affect Servicing and Originations in opposite ways: as interest rates fall, the value of the Servicing portfolio decreases due to increased prepayments, while the value of the Originations portfolio increases due to increased loan applications through more favorable refinance opportunities. *Id.* Throughout 2014, prevailing interest rates were experiencing a steady decline. ¶ 34.  Thus, Nationstar's ability to offset the adverse impact of the interest rate environment on its Servicing business through growth in its Originations business was crucial to its continued growth. ¶ 35.

The Exchange Act Defendants repeatedly touted the Originations segment's supposed growth and profitability and represented to investors that, unlike the Servicing segment, the Originations segment benefitted from a declining interest rate environment. ¶ 88.  Nationstar

---

[2] The Registration Statement, Preliminary Prospectus, Preliminary Prospectus Supplement, Prospectus, and all documents incorporated by reference, may be referred to collectively as the "Offering Materials."

proclaimed that its Originations segment was poised to not only increase profitability—which could then offset any declines in Servicing revenue—but also to continually replenish the Company's MSR portfolio[3] by retaining the MSRs from the mortgages it originated. ¶ 88. For example, within the Company's earnings presentation for 4Q14/FY14, Nationstar proclaimed that 2014 would be the Originations segment's "[r]eturn to profitability," representing that the unit provided for a "cost-effective and profitable creation of long-term servicing assets." *Id.* Defendants' focus on the Originations segment was misleading. ¶ 89. According to confidential Loan Officer-1, originating new business was not the primary focus of the Nationstar's business model, but rather its primary business plan was to recapture loans from its MSR acquisitions. *Id.*

During the Class Period, Defendants emphasized the strength of Originations' "key metrics" – the "applications pipeline" and the "locked pipeline" – as being reflective of the Originations segment's "Return to Profitability." ¶¶ 89-92. By directing investors to the Originations segment's "key metrics," which included the locked pipeline and the applications pipeline among other factors that purportedly measured the growth and profitability potential of the Originations segment, the Exchange Act Defendants misled investors into believing that, among other things, the Originations segment was poised to make up for any negative impact on Nationstar's core Servicing segment due to declining interest rates. ¶¶ 90-93.

The applications pipeline referred to mortgage loan applications made with Nationstar that were pending but had neither been locked at a specific interest rate or funded. ¶ 90. The locked pipeline referred to mortgage loan applications that were locked in at a specific interest rate but had not been funded. *Id.* Upon submitting a loan application, an applicant's loan would

---

[3] Mortgage Servicing Rights ("MSRs") are alleged to be Nationstar's principal asset. [DE 31] at ¶ 5.

first be grouped into the applications pipeline and, upon initial approval by Nationstar, would then be advanced to the locked pipeline. ¶ 91. Once a locked pipeline loan was funded, Nationstar is able to derive profits from both the sale of the loan and the retained MSR. *Id.*

According to confidential former Nationstar loan officers with direct knowledge of the Company's mortgage practices in Originations, Nationstar was aggressively seeking to expand the applications and locked pipelines, resulting in a substantial increase in applications that were either riddled with critical conditions precedent to funding or highly susceptible to cancellation due to Nationstar's inability to offer competitive interest rates. ¶ 95.  As a result, rather than progress from application volume to locked pipeline to funding (and then revenues), many of these loans had a very low likelihood of ever generating profits for Nationstar. ¶ 95. Additionally, after the expiration of the 90 to 120 day period (or, sometimes, longer), certain loans would be denied, immediately reprocessed, and routed back into the next quarter's locked pipeline, further contributing the misleading nature of the locked pipeline figure. ¶ 96.  Thus, while Nationstar represented to investors that its locked pipeline (and application volume that led to those locks) was a key indicator of future growth potential for the Originations segment and its viability as a revenue source to offset any declines in the Servicing segment, these representations were, to a material extent, illusory. ¶ 97.  Accordingly, Plaintiffs allege that "each of the locked pipeline and application pipeline/volume figures disclosed in the following Nationstar public disclosures throughout the Class Period was materially false and misleading and/or omitted material facts." ¶ 98.

The Exchange Act Defendants touted their application and locked pipelines metrics when emphasizing Originations' growth potential.   For example, during an August 6, 2014 conference call following the release earlier in the day of Nationstar's 2Q14 earnings, Bray spoke

5

optimistically about Nationstar's Originations segment: "I think in the coming quarters, there clearly will be an increase in recapture and continuing – and we are still seeing very strong application and locks. And so, I'm pretty bullish about it." ¶ 101.  Stiles also spoke positively about Originations, stating that "[t]he mark right now remains strong for originations." *Id.* Despite the apparent downturn in Servicing, Nationstar again reaffirmed its GAAP guidance of $4.00-$5.00 per share for 2014. *Id.*

On November 6, 2014, Nationstar published its financial results for 3Q14. ¶ 103.  On the earnings conference call that day, Stiles directed investors to Nationstar's accompanying earnings presentation, which also highlighted the Originations segment's locked pipeline of $2.4 billion and disclosed a $3.5 billion application pipeline. *Id.*  On that call, after earlier representing that Nationstar had "transformed [O]riginations into a significantly large and highly profitable business," Stiles highlighted the positive impact declining interest rates was having on Originations, stating "we've seen October as rates have come down, we've seen locks pick up, and we had a nice October in that business [i.e. Originations]." *Id.*

On February 26, 2015 and February 27, 2015, Nationstar announced its 4Q/FY 14 financial results and published various filings reporting the same. ¶ 104.  Plaintiffs allege that Nationstar's February 26, 2015 announcement of its 4Q/FY 14 financial results is the point at which the "true facts concerning the Exchange Act Defendants' untrue and misleading statements" "beg[a]n to emerge." ¶ 106.  While the market's consensus estimate was that Nationstar would earn $0.91 per share during 4Q14, Nationstar reported earnings of just $0.58 per share, which was due in part to the Originations segment's inability to make up for losses suffered by the Servicing unit as a result of increased servicing expense and amortization and a $46 million write-down on the value of its MSRs. ¶¶ 7, 106.  On this news, the price of

Nationstar stock declined 13.55%, from a closing price of $31.29 per share on February 25, 2014 to a closing price of $27.05 per share on February 26, 2015. ¶ 106.  On Nationstar's 4Q/FY14 earnings conference call, Bray told investors to "look at the level of locks and level of submissions we are experiencing in January 2015" and stated that "we've had in the first quarter the highest lock days we've had in the history of company and we want to make sure the capacity is focused on that." ¶ 104.  The Exchange Act Defendants' characterization of these metrics—i.e., emphasizing the Company's locked pipeline as a predictor of profitability—mitigated the sharp decline in the stock price and reassured investors that Nationstar was executing on its business plan. ¶ 104.

On May 5, 2015, Nationstar issued a press release announcing its financial results for the first quarter ended March 31, 2015 ("1Q15 Press Release"). ¶ 107.  In the 1Q15 Press Release, Nationstar announced a net loss of $0.53 per share (or $48.3 million), primarily due to the impact of declining interest rates on its MSR portfolio. ¶¶ 47, 107.  Nationstar also disclosed that its revenue had tumbled 15% year-over-year to $382 million, reflecting a 45% sequential plunge in quarterly revenue in its Servicing segment to $109 million. ¶ 107.  Even more problematic for Nationstar's Servicing segment was the fact that the declining interest rates had caused the Company to take a $110 million ($0.77 per share) write-down on the value of the Company's MSRs and realize a $17 million quarterly increase in amortization, both of which Nationstar represented were caused by the deteriorating interest rate environment, which had, among other things, led to higher prepayments of existing loans. ¶ 107.  For Originations, while the funded volume for the quarter rose, analysts noted that those volumes were offset by increased expenses of $100 million, $17 million above Wall Street expectations. ¶ 107.  Moreover, unlike prior quarters, Nationstar abandoned the reporting of its locked pipeline to the market during the first

7

quarter, despite previously identifying it as a "key metric." ¶ 107.  Plaintiffs allege that Nationstar's May 5, 2015 announcement of its 4Q/FY 14 financial results is the point at which "the full truth concerning the Exchange Act Defendants' untrue and misleading statements emerged." ¶ 106.

In the wake of Nationstar's May 5, 2015 earnings release for the first quarter of 2015, the price of Nationstar stock plummeted 25% from $26.17 per share on May 4, 2015, to a close of $19.51 per share on May 5, 2015, on unusually high trading volume of more than ten million shares. ¶ 109.

…

On or about March 30, 2015, Nationstar completed an Offering of 17,500,000 shares of common stock at a price of $28.49 per share. ¶ 37.  In connection with the Offering, Nationstar filed its Registration Statement and Preliminary Prospectus on February 27, 2015. *Id.* Thereafter, Nationstar filed the Preliminary Prospectus Supplement and Prospectus on March 25 and March 26, 2015, respectively. *Id.*  Pursuant to the Offering Materials, the Company issued and sold 17,500,000 shares of Nationstar common stock to the Underwriter Defendants, each of which was sold 5,833,334 initial shares and granted 30 day option to purchase up to an additional 2,625,000 shares of Nationstar common stock. *Id.*  In exchange, the Company reaped gross proceeds of approximately $500 million from the Offering. *Id.*  Defendants Nationstar, Bray, Stiles, Gidel, Hawkins, and Malone each signed the Registration Statement. ¶ 40.

The Offering Materials contained a section called the "Update on First Quarter 2015," which stated in part:

> Year to date, the prevailing interest rate environment continued to be favorable for our Originations segment offset by elevated prepayments when compared year over year. The level of interest rates is an important driver of the results of our business, with continued lower interest rates negatively affecting our Servicing segment and

8

positively affecting our Originations segment. The foregoing is solely as of the date of this prospectus supplement, and our actual results for the quarter ended March 31, 2015 may differ materially as a result of our performance for the remainder of the quarter as well as the completion of our financial closing procedures, final adjustments and other developments that may arise between now and the time the financial results for our first quarter are finalized.

¶ 44. Plaintiffs allege that the Offering Materials misleadingly characterized the negative consequences of the declining interest rate environment on Servicing and Nationstar's operations as only a potentiality rather than an already occurring certainty, by using the words such as "could" and "may" rather than more definitive words. ¶¶ 42-43.

Contrary to the Offering Materials' representation that any deterioration in the interest rate environment might negatively impact Nationstar's revenue and financial condition, by the time of the Offering: (i) the interest rate environment was having a deleterious impact on the Company's financial results for the first quarter of 2015 by, among other things, negatively impacting the mark-to-market value of Nationstar's MSRs, prepayment rates, amortization and the overall revenues derived from Servicing; and (ii) Nationstar was going to record a massive loss for the first quarter. ¶ 45.

On May 5, 2015, Nationstar reported a net loss of $0.53 per share ($48.3 million) for its first quarter of 2015 (which quarter ended just one day after the Offering was completed), primarily due to the impact of declining interest rates on its MSR portfolio. ¶ 47. By comparison, the Company's net income for the entire 2014 was approximately $221 million. ¶ 47. This loss was a material departure from the market's consensus estimate for the first quarter of 2015 of a profit of $0.71 per share. ¶ 47.

Less than a month after Nationstar reported a loss, Plaintiffs filed suit on June 2, 2015. *See* [DE 1]. The Amended Complaint, the operative pleading, was filed on October 16, 2015. [DE 31].

9

## II.      Standard of Review

To adequately plead a claim for relief, Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating *Conley*, 355 U.S. at 41).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556).  The allegations of the claim must be taken as true and must be read to include any theory on which the plaintiff may recover.  *See Linder v. Portocarrero*, 963 F. 2d 332, 334-36 (11th Cir. 1992) (citing *Robertson v. Johnston*, 376 F. 2d 43 (5th Cir. 1967)).

However, the court need not take allegations as true if they are merely "threadbare recitals of a cause of action's elements, supported by mere conclusory statements . . . ." *Iqbal*, 129 S. Ct. at 1949.  In sum, "a district court weighing a motion to dismiss asks 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Twombly*, 550 U.S. at n. 8 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183 (1984)).

## III.      Discussion

### a.      The Securities Act Claims

Plaintiffs assert claims under §§ 11, 12(a)(2), and/or 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o against the Securities Act Defendants -- Nationstar, Bray, Stiles, Gidel, Hawkins, Malone, and the Underwriter Defendants --  on their own behalf and on behalf

10

of all persons or entities who purchased shares in a secondary public offering (the "Offering") of 17,500,000 shares of Nationstar common stock (the "Securities Act Class") issued and sold pursuant to a registration statement on Form S-3 (File No. 333-18872), as amended by Post Effective Amendment No. 1 filed with the SEC on February 27, 2015 (the "Registration Statement"), including an accompanying preliminary prospectus filed therewith ("Preliminary Prospectus"), and a preliminary prospectus supplement ("Preliminary Prospectus Supplement") and final prospectus supplement ("Prospectus") filed pursuant to Rule 424(b) of the Securities Act with the SEC on March 25 and March 26, 2015.[4]  *See* [DE 31] at ¶ 2.

Defendant argues that no Plaintiff has standing to bring Securities Act claims, and that, in any event, the claims lack merit.

A.       *Whether Plaintiffs Lack Standing To Assert Securities Act Claims*

"[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1307 (11th Cir. 2008) (citation omitted).  To have standing under Section 11, a plaintiff must allege that it purchased shares directly in the challenged offering or that its shares are traceable to the registration statement at issue. *See APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261, 1276 (11th Cir. 2007) ("In order to have standing and prevail on a claim under Section 11 a plaintiff must be able to trace his stock to the defective registration statement.").  To have standing under Section 12(a)(2), a plaintiff must adequately allege that it purchased securities, under an allegedly defective prospectus, from a defendant that actually sold him the securities or actively and successfully solicited his purchase of the securities. *See* 15 U.S.C. § 77*l*(a)(2)

---

[4] The Registration Statement, Preliminary Prospectus, Preliminary Prospectus Supplement, Prospectus, and all documents incorporated by reference, are may be referred to collectively as the "Offering Materials."

(providing that "[a]ny person who . . . (2) offers or sells a security" may be liable "to the person purchasing such security from him.")

Defendants initially argue that Plaintiffs' Securities Act claims under Sections 11 and 12(a)(2) should be dismissed for lack of standing, as the allegations in the Amended Complaint regarding Plaintiff Ghatan (the only identified Plaintiff alleged to have purchased shares pursuant or traceable to the Offering, *see* [DE 31] at ¶ 15) are conclusory assertions that are inadequate as a matter of law.  Plaintiff's response, however, attaches and incorporates as an exhibit a document purporting to show Plaintiff Ghatan's March 25, 2015 trade confirmation from Barclays. *See* [DE 60-1] at Ex. 2.  Defendant concedes in its reply that if this Court takes judicial notice of that document and accepts Plaintiffs' representations as to the document, then Plaintiff Ghatan appears to have sufficiently supplemented its allegations as to standing at the pleading stage. *See* [DE 66] at p. 17, n. 14.  Based on the foregoing, the Court will not dismiss the Securities Act Claims for lack of standing.  However, in the event that a second amended complaint is filed in this case, the Court expects the allegations therein regarding standing to reflect the contents of this exhibit.

B.       *Whether the Amended Complaint States a Claim under the Securities Act*

Defendants argue that Plaintiffs fail to state a violation of Sections 11 and 12(a)(2), and thus a violation of Section 15[5], of the Securities Act.

To establish a prima facie claim under Section 11, a plaintiff must allege that he purchased a security issued pursuant to a registration statement that contained a material misstatement or omission. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).  A

---

[5] The failure to plead a primary violation under Section 11 or 12(a)(2) defeats the Section 15 claims. *See Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1268 (11th Cir. 2013) (Plaintiffs' failure to plausibly allege Section 11 and 12(a)(2) claims is fatal to their Section 15 claims); *see also Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001) ("Because Plaintiffs have failed to establish a primary violation under §§ 11 or 12, their § 15 claim also fails.").

Section 11 plaintiff is not required to prove that the defendant acted with scienter. *Id*; *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015). Section 11 liability against the issuer of a security "is virtually absolute, even for innocent misstatements." *Huddleston*, 459 U.S. at 382. "Other defendants bear the burden of demonstrating due diligence. *Id.* (citing 15 U.S.C. § 77k(b)).

To establish a claim under Section 12(a)(2), a purchaser of a security may bring a private right of action against anyone who offers or sells a security by means of a prospectus that contained a material misstatement or omission. 15 U.S.C. §77*l*(a)(2). Section 12(a)(2) also imposes a strict liability standard. *See In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1363 (S.D. Fla. 2001).

First, Defendants argue that the securities claims fail to state a claim because the Amended Complaint pleads no material misstatements regarding offset or risk factors. Defendants contend that the Amended Complaint rests its Securities Act claims on the mistaken premise that the Offering Materials represented that declines in the Servicing business from lower interest rates would be equally offset (or, as instead argued in Plaintiff's response to the motion to dismiss, "cushioned" or "tempered") by gains in the Originations business from lower rates, and that Nationstar somehow knew or should have known ––––– weeks before its quarterly results were completed –––––that, as a whole, the Company would suffer losses in the first quarter of 2015. The Court agrees with Defendants. The district court's description of the fundamentally and fatally defective case presented in *In re Computervision Corp. Sec. Litig.*, 914 F. Supp. 717 (D. Mass.), *aff'd sub nom. Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996) applies aptly here: "the Company simply did not say what the plaintiffs say it said. The supposed actionable 'representations' are in fact inferences drawn by the plaintiffs from isolated

13

statements which are unreasonable (if not irrational and illogical) given the surrounding language and the documents in their entirety." *Id.* at 719.

Plaintiffs' vigorous argument regarding Nationstar's allegedly materially misleading statements regarding "offset," when distilled to its substance, is that certain cherry-picked statements, read in isolation and then cobbled together while wholly ignoring all of the other coexistent statements providing additional pertinent information, would mislead investors to infer that the positive impact of lower interest rates on the Originations segment would be great enough to overcome the substantial adverse impact Nationstar clearly stated in its Offering Materials that the lower interest rates were having on the much larger (70% of the Company's business) Servicing segment, such that Nationstar would be reporting a 1Q15 profit rather than a loss.

Plaintiffs' allegations regarding the Offering Materials' supposed misrepresentations concerning risk factors fare no better.  Plaintiffs highlight the first sentence of a section in the Offering Materials called the "Update on First Quarter 2015," which stated:

> Year to date, the prevailing interest rate environment continued to be favorable for our Originations segment offset by elevated prepayments when compared year over year.

*See* [DE 31] at ¶ 44.  However, the very next sentence of that paragraph states the following:

> The level of interest rates is an important driver of the results of our business, with **continued lower interest rates negatively affecting our Servicing segment** and positively affecting our Originations segment.

*Id.* at ¶ 44 (emphasis added).  Plaintiffs' allegations that the Offering Materials mischaracterized the negative consequences of the declining interest rate environment on Servicing as only a potentiality, rather than an already occurring certainty, miss the mark in the face of this clear statement.   Moreover, Plaintiffs attack on the Offering Materials' use of the words "could" and

14

"may" rather than more definitive words, *see* [DE 31] at ¶¶ 42-45, fail not only because of the above-quoted present-language statement, but also because Plaintiffs speculate, without any of the factual allegations that are required to support such a conjecture, that Nationstar knew at the time the Offering Materials were issued that it would suffer a loss in the First Quarter of 2015. In fact, the Offering Materials make it clear that Nationstar could not make such a prediction:

> The foregoing is solely as of the date of this prospectus supplement, and our actual results for the quarter ended March 31, 2015 may differ materially as a result of our performance for the remainder of the quarter as well as the completion of our financial closing procedures, final adjustments and other developments that may arise between now and the time the financial results for our first quarter are finalized.

*See* [DE 31] at ¶ 44.

Nationstar had no duty to disclose its financial results ahead of time. *See Klein v. Maverick Tube Corp.*, 790 F. Supp. 68, 70 (S.D.N.Y. 1991) (granting company's motion to dismiss Securities Act claims where "complaint essentially allege[d] that because [company] announced lower earnings on April 15, 1991, it should have disclosed these results one month earlier in its prospectus"), aff'd, 969 F.2d 1041 (2nd Cir. 1992). The Court notes that it is undisputed that prevailing interest rates dropped almost 14% during the first quarter of 2015, with most of the drop (nearly 8%) occurring over the last 2 weeks of that quarter (March 16-31, 2015). *See* [DE 55-1 at Ex. 11]. Furthermore, the temporal proximity alleged by Plaintiffs is insufficient to raise plaintiffs' allegations above the speculative level. *See, e.g., Coronel v. Quanta Capital Holdings Ltd.*, 2009 WL 174656, at *14 (S.D.N.Y. Jan. 26, 2009) ("The Complaint cannot sufficiently allege falsity just because: 1) the mid-December estimate was revised upward by 15% . . . more than two months later, and; 2) in an evaluative report released almost a month after the loss estimates were revised, management announced that its internal financial controls were not effective as of December 31, 2005."); *Glassman v. Computervision*

15

*Corp.*, 90 F.3d 617, 632 n.24 (1st Cir. 1996) (stating that "[a]n issuer is not required to 'disclose interim operating results for the quarter in progress whenever it perceives a possibility that the quarter's results may disappoint the market'") (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1210 (1st Cir. 1996)).

Based upon the foregoing, the Court holds that Amended Complaint's Securities Act claims fail to allege material misleading statements regarding offset or risk factors.

Second, Defendants argue that the Securities Act claims fail to state a claim because the Amended Complaint pleads no material omissions under Item 303 or Item 503. The Amended Complaint alleges that the Offering Materials failed to disclose information required by Items 303 and 503 of Regulation S-K, 17 C.F.R. § 229.303 and 17 C.F.R. § 229.503. *See* [DE 31] at ¶¶ 41(b), (c), 48-54. "To avoid dismissal of a section 11 omission claim, plaintiffs must properly allege: 1) the prospectus contained an omission; 2) the omission was material; 3) defendants were under a duty to disclose the omitted material information; and 4) that such information existed at the time the prospectus became effective." *Oxford Asset Mgmt. Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002).

Defendants argue that the Amended Complaint fails to plead a violation of the duty to disclose under Item 303. Item 303 requires a registrant to describe "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii); *see J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 392 (6th Cir. 2008) ("Item 303 . . . only imposes a duty to make forward-looking projections regarding information known to the registrant."); *Oxford*, 297 F.3d at 1192 ("Item 303(a)(3)(ii) essentially says to a registrant: If there has been an important change in your company's business

16

or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus."). "To state a claim based on a failure to comply with Item 303, a plaintiff must 'allege facts showing defendants knew of an adverse trend, the material impact of that trend, and that the future material impacts are reasonably likely to occur from the present-day perspective.'" *Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 558 (M.D.N.C. 2013) (citation omitted).

Plaintiffs allege that Defendants violated the duty to disclose under Item 303 because of the alleged failure of the Offering Materials to disclose: "(i) the fact that the deteriorating interest rate environment was reasonably like to have (or were already having) a "material … unfavorable impact on … revenues" for the first quarter of 2015, and (ii) the magnitude of this unfavorable impact." [DE 31] at ¶ 52.  This claim fails.  First, as discussed *supra*, the Offering Materials adequately disclosed that the deteriorating interest rate environment was negatively affecting Nationstar's Servicing segment, which comprised the lion's share of the Company's business.  Second, the Amended Complaint fails to allege with factual specificity that as of March 24, 2015, the Securities Act Defendants knew what Nationstar's 2015 first quarter results would be, including that any future impact of the interest rate environment on 1Q15 quarter-close results was known at the time of the Offering.  Moreover, the Offering Materials explicitly cautioned prospective investors that Nationstar's "actual results for the [2015 first quarter] may differ materially" from the general update that was provided as of March 24, "as a result of" a variety of factors, including the Company's "performance for the remainder of the quarter," the "completion of our financial closing procedures, final adjustments," and other related factors. [DE 54-3 at Ex. 3, S-5].

17

Defendants also argue that the Amended Complaint fails to plead a duty to disclose under Item 503. Item 503 states, "[w]here appropriate, provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c).

Plaintiffs allege that Defendants violated the duty to disclose under Item 503 because of the alleged failure of the Offering Materials to disclose that "the Company was poised to report lower-than-expected earnings for the first quarter and that the negative impact of the interest rate environment on the Servicing segment would not be offset in full by the Originations segment." [DE 31] at ¶ 53.  This claim also fails.  The Amended Complaint fails to sufficiently allege facts demonstrating that on May 24, 2015 the Securities Act Defendants knew that Nationstar would be reporting a 1Q15 loss rather than a profit on May 5, 2015, nor that the Securities Act Defendants had formed such opinion.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326-27 (2015) (holding that a complaint alleging a Securities Act claim on the basis of an opinion must plead that the defendant did not in fact hold the opinion it stated).  Additionally, the allegation regarding Defendants' failure to disclose that the negative impact of the interest rate environment on the Servicing segment would not be offset in full by the Originations segment is nonsensical.  As discussed *supra*, there are no factual allegations demonstrating that investors would reasonably infer that the positive impact of lower interest rates on the Originations segment would be great enough to overcome the substantial adverse impact clearly stated in the Offering Materials that the lower interest rates were already having on the much larger Servicing segment of the business[6].

---

[6] Rather, the Offering Materials specifically disclosed that "[t]he level of interest rates is an important driver of the results of our business, with continued lower interest rates negatively affecting our Servicing segment." *See* [DE 31] at ¶ 19.

It is clear from a careful reading of the entire record that Plaintiffs' challenge is based on nothing more than the fact that Nationstar ultimately reported a loss for the quarter. However, the Securities Act liability exists only for material misstatements or omissions, and not as insurance to investors for any drop in stock price following adverse results.

Based on the foregoing, the Court shall dismiss the Sections 11 and 12(a)(2) claims, and correspondingly the Section 15 claims as well. *See Miyahira*, 715 F.3d at 1268.

b.        The Exchange Act Claims

Plaintiffs also allege claims on their own behalf and on behalf of a class (the "Class") consisting of all persons who purchased or otherwise acquired Nationstar common stock from May 8, 2014 through May 4, 2015 (the "Class Period") against the Exchange Act Defendants -- Nationstar, Bray, Hisey, and Stiles -- for making materially false and misleading statements during the Class Period with actual knowledge or reckless disregard for the truth of their statements violations of §§ 10(b) and/or 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. *See* [DE 31] at ¶ 85.

Defendant Bray is, and was at all relevant times, Nationstar's Chief Executive Officer ("CEO") and a member of Nationstar's Board of Directors. [DE 31] at ¶ 17.  Bray previously served as Nationstar's Executive Vice President and Chief Financial Officer ("CFO") from May 2011 to February 2012. *Id.*  In addition, he served as: (i) the President of Nationstar's wholly owned subsidiary, Nationstar Mortgage LLC, since July 2011; (ii) the CEO of Nationstar Mortgage LLC since October 2011; (iii) the CFO of Nationstar Mortgage LLC from the time he joined Nationstar in May 2000 until September 2012; (iv) a Manager of Nationstar Mortgage LLC since October 2011; and (v) a director of another subsidiary, Nationstar Capital

19

Corporation, since March 2010. *Id.*  Defendant Hisey was Nationstar's Executive Vice President and CFO until May 2014. [DE 31] at ¶ 18.  Defendant Stiles is, and has been since May 2014, Nationstar's Executive Vice President and CFO. [DE 31] at ¶ 19.  Stiles also serves as Executive Vice President and CFO at Solutionstar, which he joined in January 2013, and at Nationstar Mortgage LLC, where he has served as Executive Vice President since May 2013. *Id.*

### 1.  Section 10(b) Claim

To state a claim for securities fraud under section 10(b) of the Act and Rule 10b–5, a plaintiff must allege six elements: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on a misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called loss causation." *Instituto De Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1352 (11th Cir. 2008) (quotation omitted). To survive a motion to dismiss, a claim brought under section 10(b) of the Act or Rule 10b–5 must satisfy (1) the federal notice pleading requirements; (2) the special fraud pleading requirements found in Fed. R. Civ. P. 9(b), *see Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001); and (3) the additional pleading requirements imposed by the PSLRA, *see Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004).

Under the federal notice pleading standards, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The court must construe the reasonable inferences from well-pleaded facts in the light most favorable to the plaintiff. *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). Additionally, Rule 9(b) requires that, for complaints alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice,

20

intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R.

Civ. P. 9(b). Rule 9(b) dictates that the complaint must allege:

> (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Investor Grp.*, 658 F.3d at 1296.

The PSLRA imposes additional heightened pleading requirements.  For section 10(b) and

Rule 10b–5 claims predicated on allegedly false or misleading statements or omissions, the

PSLRA provides that "the complaint shall specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

the statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).  Specifically, the

complaint must "plead with particularity facts giving rise to a strong inference that the

defendants either intended to defraud investors or were severely reckless when they made the

alleged materially false or incomplete statements." *Mizzaro v. Home Depot, Inc*., 544 F.3d 1230,

1238 (11th Cir. 2008) (quotation marks omitted).

The Exchange Act Defendants argue that Plaintiffs' claims fail because the Amended

Complaint does not sufficiently allege a false or misleading statement or omission.  The Court

agrees.  Plaintiffs' allegations regarding Nationstar's Originations segment, including application

volume and locked pipeline, fail to show that Defendants' statements were false or misleading.

There are no allegations in the Amended Complaint demonstrating that Defendants' statements

regarding this business segment and metrics were false.  As the Court discussed, *supra*, Plaintiffs

have again isolated certain of Defendants' statements and then mischaracterized them as

21

Defendants unduly touting or emphasizing these statements.  There are no factual allegations demonstrating that investors would reasonably infer that the positive impact of lower interest rates on the Originations segment would be great enough to overcome the substantial adverse impact clearly stated by Nationstar that the lower interest rates were having on the much larger Servicing segment of Nationstar's business.  None of the challenged statements showing that Nationstar was bullish about its Originations segment in a low interest environment suggest that the Servicing segment was performing well in that environment.[7]  Further, the Amended Complaint fails to allege that Nationstar or the individual Exchange Act Defendants told investors to ignore or discount any of the many other key metrics Nationstar also disclosed for its Originations segment. *Compare* [DE 31] *with* [DE 54-4, 54-5, 54-6, 54-7, 54-8].   Moreover, there is no dispute that Nationstar accurately disclosed the number of loans actually funded, rendering entirely inadequate Plaintiffs' contentions (including those allegedly supported by confidential witnesses) that the application volume and locked pipeline metrics were misleadingly inflated because many potential loans counted in those metrics were not ultimately funded for various reasons.[8]

The Court also agrees with Defendants that Bray's May 5, 2015 earnings call comments do not constitute corrections of prior misstatements.  Rather, a full reading of Bray's entire statement demonstrates that Bray merely confirmed Nationstar's prior disclosures to the market –

---

[7] Additionally, in any event, these statements of corporate optimism would otherwise be considered inactionable puffery. *See Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1027–28 (11th Cir. 2003) (holding that the statement, "as our Company's strong performance continues," to be non-actionable puffery, which, as a matter of law, would not induce reliance).  Further, Plaintiffs challenge statements reaffirming guidance and discussing future business strategy and expected future performance, *see* [DE 31] at ¶¶ 100, 101, that are protected by the PSLRA safe harbor for forward-looking statements accompanied by meaningful cautionary language. *See Harris v. Ivax Corp.*, 182 F.3d 799, 803-05 (11th Cir. 1999); 15 U.S.C. § 78u-5(i)(1)(A)-(C).

[8] Additionally, there is no allegation in the Amended Complaint that there was not a positive relationship between a growth in the application volume and locked pipeline numbers and the number of loans ultimately funded.

that the Originations business was doing well but that the Servicing segment was continuing to suffer from the low interest rate environment:

> And I think if you think about the segments, Paul, clearly, originations is going to exceed kind of what we thought for the year. They had a great quarter. They had great April. And again, certainly, somewhat depending on rates, but it will exceed expectations. I think Solutionstar will as well and will continue to make some investments there. But when you look at kind of on a run-rate basis, they're going to meet or exceed expectations. I think, it's the servicing business that we got to continue to focus on and continue to see if we can, a, the volatility with rates certainly has had an impact; and b, we've got to continue to get some of those revenue pieces that I've talked about and continue to drive our costs down. But that's the one where we've got to continue to focus on the core operations, and frankly, the volatility with the rates.

*See* [DE 54-16] at pp. 7-8.  Plaintiffs fail to identify new information revealed by Bray's comments. *See FindWhat Inv'r Grp.*, 658 F.3d at 1311-12 n.28 ("[B]ecause a corrective disclosure must reveal a previously concealed truth, it obviously must disclose new information, and cannot be merely confirmatory").

Based on all the foregoing, the Court concludes that Plaintiffs fail to allege actionable false and misleading statements and omissions to support their Exchange Act claims.  The Amended Complaint makes it clear that Plaintiffs' claims rest on nothing more than the fact that Nationstar ultimately reported a loss for the quarter.

Moreover, as an independent ground for dismissal, the Exchange Act Defendants also argue that Plaintiffs' claims fail because the Amended Complaint's allegations do not support the required strong inference of scienter.  Section 10(b) and Rule 10b–5 require a showing of either an "intent to deceive, manipulate, or defraud," or "severe recklessness." *Mizzaro*, 544 F.3d at 1238. "Severe recklessness" is a term reserved for those highly unreasonable omissions or misrepresentations that involve "extreme departure" from the standards of ordinary care and that

23

present a danger of misleading buyers or sellers which is either known to the defendant or is "so obvious" that the defendant must have been aware of it. *Id*.

The PSLRA raised the standard for pleading scienter in a securities fraud action. Specifically, "the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind*." 15 U.S.C. § 78u–4(b)(2) (emphasis added). A "strong inference" of scienter means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007). In making the scienter inquiry, "courts must consider the complaint in its entirety," counting any omissions and ambiguities in the complaint against an inference of scienter. *Id.* at 322, 326. "Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute." *FindWhat Investor Grp.*, 658 F.3d at 1296. The inquiry is "inherently comparative" because courts "must take into account plausible opposing inferences." *Id*. at 323.

Plaintiffs allege that the individual Exchange Act Defendants -- Bray, Stiles, and Hisey – had scienter based upon their respective positions at Nationstar and their access to Nationstar data. *See* [DE 31] at ¶¶ 114-116].  However, merely holding a high level position is not a compelling indicia of scienter. *See Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1224 (M.D. Fla. 2014) (stock ownership and high level position insufficient to establish scienter); *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002) ("Mere allegations that Defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter."). Moreover, Plaintiffs' allegations that the individual Defendants had the requisite scienter based

24

upon their access to Nationstar data on a computer system and the public statements that the Defendants made fails for the same reasons, articulated *supra*, that the Amended Complaint does not sufficiently allege a false or misleading statement or omission. [9] Plaintiffs' allegations do not come close to overcoming the high bar for scienter pleading set by the PSLRA requiring a "cogent" and "compelling" inference.[10]

### 2.  Section 20(a) Claim

Under Section 20(a) of the Exchange Act, to state a claim for controlling person liability against a defendant, it must be alleged that the defendant had (1) the power to control the general affairs of the entity primarily liable for the Section 10(b) or Rule 10b–5 violation at the time of the violation, and (2) the power to control or influence the specific policy that resulted in the primary violation under Section 10(b) or Rule 10b–5. *In re Unicapital Corp. Sec. Litig*., 149 F.Supp.2d 1353, 1367 (S.D. Fla. 2001) (citing *Brown v. Enstar Group, Inc*., 84 F.3d 393, 396 (11th Cir. 1996)).  Here, because Plaintiffs have failed to plead a primary violation under Section 10(b) or Rule 10b–5 of the Exchange Act, the Section 20(a) controlling persons claims must also be dismissed. *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001).

### IV.   Conclusion

Based upon the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1.       Defendants' Motion for the Court to Take Judicial Notice [DE 54] is **GRANTED**;

2.       Defendants' Motion to Dismiss the Amended Complaint [DE 55] is **GRANTED;**

---

[9] Similarly, Plaintiffs' allegations that Bray had the requisite scienter because he was provided detailed information on a weekly basis regarding Nationstar's key financial metrics fails for the same reasons articulated *supra* that the challenged representations regarding application volume and locked pipeline metrics were not misleading statements.

[10] Finally, the Court agrees with Defendants that the absence of any allegations in the Amended Complaint that any Defendant benefited in some concrete and personal way – such as suspicious stock sales—from the alleged fraud, while not required, weighs against inferring scienter. *See Mizzaro*, 544 F.3d at 1253, 1256.

3. The Amended Complaint [DE 31] is hereby **DISMISSED**; and

4. While it does not appear to the Court that any amendments would be successful, the Court in an abundance of caution will allow Plaintiffs permission to file a second amended complaint in accordance with the rulings in this Order on or before July 11, 2016.  Failure to file a second amended complaint by that deadline will result in the dismissal of this action with prejudice.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 20th day of June, 2016.

WILLIAM P. DIMITROULEAS
United States District Judge


Copies furnished to:

Counsel of record